[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 02-12281

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 15, 2003
THOMAS K. KAHN
CLERK

D. C. Docket No. 99-02707-CV-T-25-C

PEEK-A-BOO LOUNGE OF BRADENTON, INC.,
a Florida corporation,
M. S. ENTERTAINMENT, INC.,
a Florida corporation,

Plaintiffs-Appellants,

versus

MANATEE COUNTY, FLORIDA,
a political subdivision of the State of Florida,

Defendant-Appellee.

Appeal from the United States District Court
for the Middle District of Florida

(July 15, 2003)

Before EDMONDSON, Chief Judge, BARKETT and COX, Circuit Judges.

BARKETT, Circuit Judge:

Peek-A-Boo Lounge of Bradenton, Inc. and M.S. Entertainment, Inc. d/b/a Temptations II ("the Adult Lounges"), two adult dancing establishments, appeal the District Court's grant of summary judgment to Manatee County, Florida ("the County"), upholding the constitutionality of two County ordinances that regulate adult dancing establishments and public nudity. The Adult Lounges argue that Ordinance 98-46, which imposes requirements on the physical layout of adult dancing establishments and allows the County Sheriff to search such premises without a warrant, and Ordinance 99-18, a general public nudity statute, violate their First, Fourth, Fifth, and Fourteenth Amendment rights. In addition, the Adult Lounges contend that both ordinances impair their previously approved settlement agreement with the County and thus violate the Contract Clause, U.S. Const. Art. I, §10, cl. 1. Finally, the Adult Lounges maintain that Ordinance 99-18 is both preempted by, and inconsistent with, Florida state law.

## I. BACKGROUND

In 1987, Manatee County adopted Ordinance 87-07, an "Adult Entertainment Code," which made the locations of Appellants' existing businesses, the County's only two licensed adult dancing facilities, nonconforming. Appellants filed suit in federal court challenging the

2

constitutionality of the ordinance. The parties settled the lawsuit on April 11, 1989, with an agreement that allowed the Adult Lounges to continue to provide adult entertainment. The settlement effectuated a permanent injunction that enjoined the County from enforcing Ordinance 87-07 against the Adult Lounges for the current use of their properties.

Almost ten years later, on November 24, 1998, the Manatee County Board of County Commissioners ("the Board") enacted a similar ordinance, Ordinance 98-46, which amended the County's Adult Entertainment Code, Chapter 2-2.5-59 of the Manatee County Code of Laws, by providing specific physical requirements for premises used as adult dancing establishments, and which again made Appellants' businesses nonconforming.[1]

---

[1] Ordinance 98-46 amended § 2-2.5-59 of the Manatee Code by adding the following provisions (g) through (o).

    (g) All adult dancing establishment premises shall have an entrance room or lobby, i.e., the room which is entered from the outside, and sanitary facilities as set forth in subsection 2-2.5-56(f). The entrance room or lobby may be as large or small as the licensee chooses.

    (h) All other rooms in adult dance establishment premises must either:
        (1) be not less than one thousand square feet in area; or
        (2) be clearly marked in letters not less than two inches in height "No Customers or Patrons Allowed."

    (i) Except for sanitary facilities, no doorway or entranceway within any premises shall be locked at any time a customer is anywhere within the premises or at anytime the premises are open to the public unless customers or patrons are prohibited at all times from going into the rooms or areas behind such doorways or entranceways and provided such doors are marked as set forth in paragraph (h)(2) above.

    (j) At least one doorway into or out of the adult dancing establishment premises shall be unlocked at anytime a customer is anywhere within an adult dancing establishment

3

Four months later, Manatee County adopted "Public Nudity Ordinance" 99-18, which made it unlawful "to knowingly, intentionally, or recklessly appear, or cause another Person to appear, Nude in a Public Place." Although Ordinance 99-18 was not exclusively directed toward adult entertainment establishments, its stated aim was, inter alia, to prevent "incidents of prostitution, sexual assaults and batteries, [and] other criminal activity" that the County found to be associated with "the mere appearance of nude persons in public places." The ordinance identified "public places" to include "streets, sidewalks, parks, beaches, [and] business and commercial establishments." Ordinance 99-18 also defined "nudity" broadly, to include the wearing of any opaque swimsuit or lingerie covering less than one-

---

premises or at anytime the premises are open to the public.

(k) All rooms open to the public in any adult dancing establishment premises shall be lighted such that the light intensity at every point thirty inches above the floor is not less than one-half footcandle.

(l) The Sheriff shall have access to all rooms at all times any adult dancing establishment premises are open to the public. Premises are irrebuttably presumed to be open at any time a customer is on the premises. This access shall be for inspection purposes only.

(m) No room other than a sanitary facility or room marked as set forth in (h)(2) shall have any dividers or partitions or any other thing in excess of three feet in height which blocks the view of any portion of the room.

(n) Private rooms are prohibited within the adult dancing establishment premises.

(o) No room within the premises shall have its doorway or threshold blocked or obscured by doors, curtains, drapes or any other obstruction unless the room is (1) a sanitary facility, (2) the room is an adult motion picture theater in which movies are shown on a screen, or (3) a room marked as set forth in paragraph (h)(2), hereinabove.

4

third of the buttocks or one-fourth of the female breast.[2]  Further, the ordinance

---

[2] Ordinance 99-18 defined "Nude" to refer to any person "five years of age or older" who is:
> "insufficiently clothed in any manner so that any of the following body parts are not entirely covered with a fully opaque covering: (1) The male or female genitals, . . . (2) The male or female pubic area, . . . (3) The female Breast . . . or (4) The Buttocks."

The ordinance also contained unusually elaborate definitions of "Breast" and "Buttocks." Ordinance 99-18 defined "Breast" as:
> "A portion of the human female mammary gland (commonly referred to as the female breast) including the nipple and the areola (the darker colored area of the breast surrounding the nipple) and an outside area of such gland wherein such outside area is (i) reasonably compact and contiguous to the areola and (ii) contains at least the nipple and the areola and 1/4 of the outside surface area of such gland."

The ordinance allowed that "[e]ach female Person may determine which 1/4 or her Breast surface area . . . contiguous and containing the nipple and areola is to be covered."  Ordinance 99-18 defined "Buttocks" as:
> "The area at the rear of the human body (sometimes referred to as the gluteus maximus) which lies between two imaginary straight lines running parallel to the ground when a person is standing, the first or top such line being 1/2 inch below the top of the vertical cleavage of the nates (i.e., the prominence formed by the muscles running from the back of the hip to the back of the leg) and the second or bottom such line being 1/2 inch above the lowest point of the curvature of the fleshy protuberance (sometimes referred to as the gluteal fold), and between two imaginary straight lines, one on each side of the body (the 'outside lines'), which outside lines are perpendicular to the ground and to the horizontal lines described about and which perpendicular outside lines pass through the outermost point(s) at which each nate meets the outer side of each leg. Notwithstanding the above, Buttocks shall not include the leg, the hamstring muscle below the gluteal fold, the tensor fasciae latae muscle or any of the above-described portion of the human body that is between either (i) the left inside perpendicular line and the left outside perpendicular line or (ii) the right inside perpendicular line and right outside perpendicular line. For the purpose of the previous sentence, the left inside perpendicular line shall be an imaginary straight line on the left side of the anus (i) that is perpendicular to the ground and to the horizontal lines described about and (ii) that is 1/3 of the distance from the anus to the left outside line, and the right inside perpendicular line shall be an imaginary straight line on the right side of the anus (i) that is perpendicular to the ground and to the horizontal lines described above and (ii) that is 1/3 of the distance from the anus to the right outside line."

The ordinance summarized this definition by stating: "The above description can generally be described as covering 1/3 of the buttocks centered over the cleavage for the length of the cleavage."

5

specifically prohibited erotic dancers and others from appearing in public wearing "G-strings, T-backs, dental floss, and thongs."

In passing Ordinance 99-18, the Board rejected the recommendation by the Manatee County Public Planning Commission that the ordinance "shall not apply to duly licensed adult entertainment establishments" like the Adult Lounges. However, in order to address possible overbreadth and other constitutional problems, the Board acknowledged in the ordinance's preamble that "there may be instances where appearing Nude in a Public Place may be expressive conduct incidental to and a necessary part of the freedom of expression that is protected by United States or Florida constitutional provisions." The ordinance also exempted from its coverage any "bona fide live communication, demonstration, or performance . . . [that] is not a guise or pretense utilized to exploit nudity for profit or commercial gain."

One month before the two ordinances were to take effect, the Adult Lounges filed a complaint in the United States District Court, Middle District of Florida, pursuant to 42 U.S.C. § 1983,[3] alleging that the ordinances were unconstitutional.

_____

[3] 42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

Specifically, the Adult Lounges argued that both ordinances were overbroad, were adopted on the basis of an improper predicate, failed to advance any legitimate governmental interest, constituted an invalid taking, and impaired the County's contractual obligations under the 1989 settlement; that Ordinance 99-18 was unconstitutionally vague; and that Ordinance 98-46 violated both the Fourth Amendment's prohibition of warrantless searches and the Fourteenth Amendment's guarantee of equal protection. The Adult Lounges also included claims for several alleged violations of Florida law.

On January 11, 2001, having submitted to the District Court a record of the evidence it relied on when enacting the ordinances, the County moved for summary judgment. The Adult Lounges opposed this motion and submitted affidavits and expert studies contesting the County's findings concerning the negative effects caused by its businesses on the surrounding community. The District Court granted the County's motion for summary judgment, and this appeal followed.

## II. STANDARD OF REVIEW

We review the District Court's grant of final summary judgment de novo, viewing the record and drawing all reasonable inferences in the light most favorable to the non-moving party. See Patton v. Triad Guar. Ins. Corp., 277 F.3d

7

1294, 1296 (11th Cir. 2002). The constitutionality of a statute is a question of law subject to de novo review. See, e.g., Williams v. Pryor, 229 F.3d 1331, 1334 (11th Cir. 2000); United States v. Harden, 37 F.3d 595, 602 (11th Cir. 1994).

### III. DISCUSSION

### A. Summary of Supreme Court's "Secondary Effects" Jurisprudence

This case involves two ordinances, a zoning ordinance and a general public nudity ordinance, both of which are alleged to violate Appellants' First Amendment rights to freedom of expression. To guide our analysis, we begin with a comprehensive summary of the Supreme Court's jurisprudence in this area. The discussion is extensive, in part because of the large number of no-clear-majority decisions of the Court in cases of this type. Moreover, our task is complicated because although the Court has formulated distinct standards for evaluating the two kinds of regulation enacted by the County in this case–zoning ordinances and public nudity ordinances–the Court also has sometimes collapsed the two categories into a single, overarching category of regulatory action targeting the negative "secondary effects" of non-obscene adult entertainment and drawn conclusions about this single category. See generally City of Los Angeles v. Alameda Books, 122 S.Ct. 1728 (2002); City of Erie v. Pap's A.M., 529 U.S. 277

8

(2000); <u>Barnes v. Glen Theatre</u>, 501 U.S. 560 (1991); <u>City of Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41 (1986). Additionally, the Court has occasionally borrowed specific doctrines developed in one category of case to apply to the other. <u>See, e.g.</u>, <u>Alameda Books</u>, 122 S.Ct. at 1736 (plurality opinion) (relying on the Court's holding in <u>Pap's A.M.</u>, a case involving a public nudity ordinance, to explicate the evidentiary showing necessary to sustain an adult entertainment zoning ordinance); <u>Barnes</u>, 501 U.S. at 583-84 (Souter, J., concurring) (relying on the evidentiary standard described in <u>Renton</u>, a zoning case, to explicate the evidentiary showing necessary to sustain a public nudity ordinance). After identifying the applicable standards, we apply them to each of the ordinances at issue in this case.

<u>1. California v. LaRue and Doran v. Salem Inn</u>

The Supreme Court first recognized the existence of First Amendment freedom of expression rights in the adult entertainment context in <u>California v. LaRue</u>, 409 U.S. 109 (1972). In that case, the Court upheld the constitutionality of state-wide licensing regulations enacted by the California Department of Alcoholic Beverage Control that prohibited sexually explicit live entertainment in establishments licensed to sell liquor. The Court held that California had broad

latitude under the Twenty-first Amendment to control the manner and circumstances under which liquor may be sold.[4] The Court acknowledged that "at least some of the performances to which these regulations address themselves are within the limits of the constitutional protection of freedom of expression." LaRue, 409 U.S. at 118. However, the Court emphasized that "the critical fact is that California has not forbidden these performances across the board" but "merely proscribed such performances in establishments that it licenses to sell liquor by the drink." Id.

However, in Doran v. Salem Inn, 422 U.S. 922 (1974), the Court affirmed the grant of a preliminary injunction against the enforcement of a town ordinance which proscribed topless dancing in bars as well as prohibiting "any female from appearing in 'any public place' with uncovered breasts." Doran, 422 U.S. at 933.[5] The Court declared that "although the customary 'barroom' type of nude dancing may involve only the barest minimum of protected expression, we recognized [in

[4] The Twenty-first Amendment provides in pertinent part that "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI, § 2.

[5] Doran does not clearly state whether the town ordinance was a zoning ordinance or a nudity ordinance. The ordinance is described as "Local Law No. 1-1973, an ordinance making it unlawful for bar owners and others to permit waitresses, barmaids, and entertainers to appear in their establishments with breasts uncovered or so thinly draped as to appear unconvered." 422 U.S. at 924.

10

LaRue] that this form of entertainment might be entitled to First and Fourteenth Amendment protection in some circumstances." Id. at 932. The Court held that, unlike the regulations at issue in LaRue, the ordinance in Doran was overbroad because it applied to all commercial establishments, not only those selling liquor by the drink, and thus was not justifiable under the Twenty-first Amendment.[6]

2. Young v. American Mini-Theatres

In Young v. American Mini Theatres, 427 U.S. 50 (1976), the Court recognized for the first time that regulations of adult entertainment could be justified with reference to its negative effects on the surrounding community. The Court upheld portions of a Detroit "Anti-Skid Row" zoning ordinance that required adult movie theaters and bookstores to be dispersed throughout limited portions of the city but did not ban them entirely.[7] However, although a majority of the Court

---

[6] In 44 Liquormart, Inc., v. Rhode Island, 517 U.S. 484 (1996), which invalidated Rhode Island's ban on advertisements of retail liquor prices, the Court reaffirmed the holding of LaRue but disavowed its reasoning insofar as it relied on the Twenty-first Amendment. The Court concluded that "LaRue would have [had] precisely the same result if it had placed no reliance on the Twenty-First Amendment" because "[e]ntirely apart from the Twenty-First Amendment, the State has ample power to prohibit the sale of alcoholic beverages in inappropriate locations." Id. at 516. The Court did not, however, explain the effect of its holding in 44 Liquormart on Doran.

[7] The ordinance prohibited the operation of any adult entertainment movie theater within 1000 feet of any two other "regulated" uses (such as adult bookstores, bars, hotels, and cabarets), or within 500 feet of a residential area. Young, 427 U.S. at 52.

agreed that the zoning ordinance was constitutional, no single rationale for the decision enjoyed the assent of five Justices.

The plurality opinion, written by Justice Stevens, held that the sexually explicit expression being regulated by the ordinance, though not altogether unprotected, was of lower value than core, political speech. See Young, 427 U.S. at 70 (plurality opinion) (characterizing "society's interest in protecting this type of expression" as "of a wholly different, and lesser, magnitude than the interest in untrammeled political debate."). The plurality concluded that the zoning ordinance constituted "nothing more than a limitation on the place where adult films may be exhibited" that was justified by the city's interest in "preserving the character of its neighborhoods." Id. at 71.

Justice Powell, who provided the fifth vote necessary to sustain the ordinance, rejected the plurality's view "that nonobscene, erotic materials may be treated differently under [the] First Amendment." Id. at 73 n. 1 (Powell, J., concurring). Unlike the plurality, Justice Powell analyzed the constitutionality of the zoning ordinance under the four-part test outlined in United States v. O'Brien, 391 U.S. 367 (1968). O'Brien was not an adult entertainment case but involved a Vietnam-era war protester who claimed that the act of burning a draft card was constitutionally protected expression. Rejecting his claim, the O'Brien Court held

12

that government regulation of expressive conduct is sufficiently justified if (1) it is "within the constitutional power of the Government"; (2) "it furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." O'Brien, 391 U.S. at 376-377.  Applying this test to the Detroit zoning ordinance, Justice Powell found that the ordinance was justified because (1) "the ordinance was within the power of the Detroit Common Council to enact"; (2) "the interests furthered by this ordinance are both important and substantial," since "[w]ithout stable neighborhoods . . . large sections of a modern city quickly can deteriorate into an urban jungle with tragic consequences to social, environmental, and economic values"; (3) "Detroit has not embarked on an effort to suppress free expression"; and (4) based on the evidence presented to the council, "the degree of incidental encroachment upon such expression was the minimum necessary to further the purpose of the ordinance." Young, 427 U.S. at 80-82.

Unlike the four dissenters, who found the Detroit zoning ordinance to be content-based, and thus discerned in the Court's holding a "drastic departure from established principles of First Amendment law," id. at 84 (Stewart, J., dissenting), Justice Stevens and Justice Powell agreed that the ordinance was unrelated to the

13

suppression of expression. Although they evaluated the ordinance under different standards, Justices Stevens and Powell also agreed that the ordinance was justified in part by the city's interest in protecting its neighborhoods against certain negative effects associated with adult entertainment. See 427 U.S. at 71, n. 34 (plurality opinion) (noting that the city enacted the ordinance because "a concentration of 'adult' movie theaters causes the area to deteriorate and become a focus of crime," adding "it is this secondary effect which these zoning ordinances attempt to avoid, not the dissemination of 'offensive' speech."); id. at 83, n. 6 (Powell, J., concurring) ("We have here merely a decision by the city to treat certain movie theaters differently because they have markedly different effects upon their surroundings."). In Young, therefore, a majority of Justices endorsed, for the first time, the notion that zoning ordinances impacting sexually explicit adult entertainment could be justified with reference to its unwanted "secondary effects."

### 3. Schad v. Mount Ephraim

This concept was not without limits, however, as the Court's next encounter with adult entertainment, Schad v. Mount Ephraim, 452 U.S. 61 (1981), made clear. Schad involved a challenge to a zoning ordinance brought by the operators of a store selling adult materials who added a coin-operated mechanism enabling

customers to watch a live, nude dancer performing behind a glass panel. The ordinance, Mount Ephraim, N.J., Code § 99-15B (1), (2) (1979), described "permitted uses" in the community's small commercial zone and prohibited all other uses. The Supreme Court struck down the ordinance, which had been construed by the state courts to forbid nude dancing, because it "prohibit[ed] a wide range of expression long been held to be within the protection of the First and Fourteenth Amendments" and the municipality's alleged justifications for its blanket prohibition were inadequate. Schad, 452 U.S. at 65. Writing for the majority, Justice White held that "when a zoning law infringes on a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest." Id. at 68. In this case, none of Mount Ephraim's asserted justifications for its ordinance could withstand this heightened scrutiny, since it had "presented no evidence" to defend its claims that problems "associated with live entertainment, such as parking, trash, police protection, and medical facilities" were "more significant than those associated with various permitted uses," that "live entertainment [was] incompatible" with the permitted uses, or that "the kind of entertainment appellants wish to provide [was] available in reasonably nearby areas." Id. at 73-76.

4. Renton v. Playtime Theatres, Inc.

In Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986), the Court upheld a city's zoning ordinance that unlike the ordinance in Young attempted to regulate the location of adult movie theaters by concentrating them rather than by dispersing them.[8] Writing for the majority, Justice Rehnquist relied on Young but outlined a new analytical framework for evaluating this type of regulation.

The Court's analysis involved three steps. First, the Court found that since the Renton ordinance did not ban adult theaters altogether but merely regulated where they could be located, the ordinance was properly analyzed as a time, place and manner regulation. Id. at 46. Second, the Court considered whether the ordinance was content-based or content-neutral. The Court noted that content-based ordinances are presumptively invalid and subject to strict scrutiny, but found that the Renton ordinance did not fall into that category, since it "aimed not at the content of the films shown at adult motion picture theaters but rather at the secondary effects of such theaters on the surrounding community." Id. at 47 (emphasis added). Third, the Court considered whether, as a content-neutral time, place and manner regulation, the ordinance was "designed to serve a substantial

_____

[8] The ordinance prohibited any adult movie theater "from locating within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, or park, and within one mile of any school," 475 U.S. at 44, a prohibition which effectively left only "520 acres, or [approximately] five percent of the entire land area of Renton, open to use as adult theater sites." Id. at 53.

16

governmental interest and allows for reasonable alternative avenues of communication," id. at 50, and found that these conditions were met. The Court rejected the Ninth Circuit's contention that the city's justifications for the ordinance were "conclusory and speculative" because "the Renton ordinance was enacted without the benefit of studies relating to 'the particular problems or needs of Renton.'" Id. Instead, the Court held that "the First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." Id. at 51-52.

5. Barnes v. Glen Theatre, Inc.

The Court examined the constitutionality of restrictions on adult entertainment again in Barnes v. Glen Theatre, Inc., 501 U.S. 560, 111 S.Ct. 2456 (1991). Unlike Young, Schad, and Renton, Barnes involved a public indecency statute rather than a zoning ordinance. Confronting this issue for the first time, the Court upheld an Indiana indecency statute that had the effect of requiring dancers in adult establishments to wear pasties and G-strings. Barnes, 501 U.S. at 572.

17

However, although five justices agreed that the statute should be upheld, they were again unable to agree on a single rationale.

Chief Justice Rehnquist, joined by Justices O'Connor and Kennedy, recognized that the Court's previous decisions in LaRue, Doran, and Schad implied that nude dancing was "expressive conduct protected by the First Amendment." Id. at 565. Accordingly, Chief Justice Rehnquist analyzed the Indiana statute in light of the four-part test for expressive conduct established in O'Brien. Applying this test, he found that the statute was justified "despite its incidental limitations on some expressive activity." Id. at 567.[9]

Justice Scalia and Justice Souter each wrote separately, concurring in the judgment of the Court but upholding the Indiana statute on different grounds from each other and from the plurality. Justice Scalia found that the statute withstood

---

[9] The Rehnquist plurality found each of O'Brien's four conditions was satisfied. First, the public nudity statute was clearly in the State's constitutional power to enact. Barnes, 501 U.S. at 567. Second, the statute furthered the State's substantial interest in "protecting societal order and morality." Id. Third, this interest was unrelated to the suppression of free expression, since Indiana proscribed nudity across the board and did not specifically target the erotic message conveyed by nude dancing. Id. at 571 ("[T]he requirement that the dancers don pasties and G-strings does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic . . . . [p]ublic nudity is the evil the State seeks to prevent, whether or not it is combined with expressive activity."). Finally, Indiana's statute satisfied the fourth requirement of O'Brien that any incidental restriction on First Amendment freedoms be no greater than essential to further the government's interests. "It is without cavil that the public indecency statute is 'narrowly tailored'; Indiana's requirement that the dancers wear at least pasties and G-strings is modest, and the bare minimum necessary to achieve the State's purpose." Id. at 572.

constitutional challenge, not because it survived the O'Brien test, but because "as a general law regulating conduct and not specifically directed at expression, it is not subject to First Amendment scrutiny at all." Id. By contrast, Justice Souter agreed with the plurality that nude dancing was expressive conduct protected by the First Amendment and appropriately analyzed under O'Brien. However, he parted company with them over how to understand and apply O'Brien's second requirement that government regulation of expressive conduct further important or substantial government interests. According to Justice Souter, these interests need not be limited to "protecting societal order and morality," as the plurality argued. Instead, like the zoning cases, they should be interpreted to include "the State's substantial interest in combating the secondary effects of adult entertainment establishments . . . [such as] prostitution, sexual assault, and other criminal activity." Id. at 582-83.

Because Justice Souter provided the narrowest grounds for the judgment of the Court in Barnes, his concurrence constitutes the holding of that case under the rule of Marks v. United States for interpreting fragmented Supreme Court decisions.[10] Hence his opinion demands close scrutiny. In identifying secondary

[10] In Marks v. United States, 430 U.S. 188, 193, 97 S. Ct. 990, 993 (1977), the Supreme Court held that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Justice Souter's

19

effects as an appropriate basis for upholding the Indiana statute, Justice Souter

relied heavily on the Supreme Court's decisions in Renton and Young. Though

neither of these cases involved nude dancing, Justice Souter reasoned that because

nude dancing and the forms of adult entertainment at issue in Young and Renton

were "plainly of the same character," they were "likely to produce the same

pernicious effects." Barnes, 501 U.S. at 584. He thus concluded that the Renton

Court's "recognition that legislation seeking to combat the secondary effects of

adult entertainment need not await localized proof of those effects," id., could be

applied to the specific case of nude dancing. Indiana could reasonably rely on the

findings and experiences of other similar localities in order to conclude that

forbidding nude dancing furthered its interest in preventing secondary effects, and,

in that case, the state need not justify those restrictions by its own local studies. Id.

at 584. Hence O'Brien's second prong was satisfied. So too was O'Brien's third

condition, since the State's interest in banning nude dancing was not related to the

suppression of free expression but resulted from a simple correlation of nude

dancing with secondary effects. Id. at 585. Finally, Justice Souter found that

---

concurrence in Barnes constitutes the holding of that case, since he concurred in the Court's judgment on the narrowest ground. See, e.g., Ben's Bar, Inc., v. Village of Somerset, 316 F.3d 702, 718, n. 4 (7th Cir. 2003) ("Under Marks, Justice Souter's concurrence is the controlling opinion in Barnes, as the most narrow opinion joining the judgment of the Court"); Farkas v. Miller, 151 F.3d 900, 904 (8th Cir. 1998) ("Justice Souter presented the narrowest resolution of the issues in Barnes").

20

O'Brien's fourth requirement was also met, since the restrictions at issue in Barnes were minor. "Pasties and a G-string moderate the expression to some degree, to be sure, but only to a degree. Dropping the final stitch is prohibited, but the limitation is minor when measured against the dancer's remaining capacity and opportunity to express the erotic message." Id. at 587.

6. City of Erie v. Pap's A.M.

The Court revisited the issue of nude dancing in City of Erie v. Pap's A.M., 529 U.S. 277, 120 S.Ct. 1382 (2000). In another splintered opinion, the Court upheld a public indecency ordinance similar to the statute at issue in Barnes. Pap's A.M., 529 U.S. at 283. Writing for a four-justice plurality, in an opinion stating the holding of the Court under Marks, Justice O'Connor began by "clarify[ing] that government restrictions on public nudity . . . should be evaluated under the framework set forth in O'Brien for content-neutral restrictions on symbolic speech." Id. at 289. Justice O'Connor then concluded that Erie's ordinance was justified under the four requirements of O'Brien. The first and third of those requirements–that the regulation was within the government's power to enact and that the government's interest was unrelated to the suppression of expression–were easily satisfied. Id. at 296, 301. In connection with the second O'Brien

21

requirement that the government's regulation further an important or substantial interest, Justice O'Connor reasoned that the evidentiary standard described in Renton and in Justice Souter's concurrence in Barnes was the appropriate measure of whether Erie's ordinance furthered the city's interest in combating the harmful secondary effects associated with nude dancing. As she emphasized, that evidentiary requirement was a weak one:

> In terms of demonstrating that such secondary effects pose a threat, the city need not "conduct new studies or produce evidence independent of that already generated by other cities" to demonstrate the problem of secondary effects, "so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." [Renton] Because the nude dancing at Kandyland is of the same character as the adult entertainment at issue in Renton, Young . . . [and] LaRue, it was reasonable for Erie to conclude that such nude dancing was likely to produce the same secondary effects. And Erie could reasonably rely on the evidentiary foundation set forth in Renton and [Young] to the effect that secondary effects are caused by the presence of even one adult entertainment establishment in a given neighborhood. In fact, Erie expressly relied on Barnes and its discussion of secondary effects, including its reference to Renton and [Young]. . . . [T]he evidentiary standard described in Renton controls here, and Erie meets that standard.

Id. at 296-97 (internal citations omitted). Finally, Justice O'Conner found that O'Brien's fourth condition that any incidental limitation on protected expression be no greater than necessary was satisfied, since "[t]he requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted

government interests . . . [that] leaves ample capacity to convey the dancer's erotic message." Id. at 301.

Justice Scalia, joined by Justice Thomas, agreed that Erie's ordinance was constitutional, but did so on an entirely different basis. Reiterating the view he expressed in Barnes, Justice Scalia deemed the ordinance to be a total ban on public nudity, which was aimed at conduct, not expression, and thus was not subject to First Amendment scrutiny at all. Id. at 307-08. Meanwhile, Justice Souter filed a concurring and dissenting opinion, agreeing with the plurality that the O'Brien test governed, but dissenting from the Court's judgment in the case because he disagreed with how the plurality applied the second prong of O'Brien. On Justice Souter's view, the record failed to reveal "any evidence on which Erie may have relied, either for the seriousness of the threatened harm or for the efficacy of its chosen remedy." 529 U.S. 277 at 314. As such, the record did not permit the conclusion "that Erie's ordinance is reasonably designed to mitigate real harms." Id. at 317. Since, on his view, O'Brien's second condition was not satisfied, Justice Souter would have remanded the case to permit Erie to attempt to make that factual showing.[11]

---

[11] Justice Souter acknowledged that his partial dissent "rests on a demand for an evidentiary basis that I failed to make when I concurred in Barnes. I should have demanded the evidence then, too . . . after many subsequent occasions to think further about the needs of the First Amendment, I have come to believe that a government must toe the mark more carefully than I first insisted."

7. City of Los Angeles v. Alameda Books, Inc.

The Court's most recent case involving adult entertainment was City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 122 S.Ct. 1728 (2002), a case in which adult businesses challenged the constitutionality of a city zoning ordinance forbidding two or more such businesses from operating in the same building. The Supreme Court reversed a lower court judgment granting summary judgment to the adult businesses, holding that Los Angeles could reasonably rely, at this stage of the litigation, on a police department study of the effect of adult businesses on crime patterns to overcome summary judgment. Once again, however, no single rationale justifying the result enjoyed the assent of five Justices.

The narrow question presented in Alameda Books was the appropriate standard "for determining whether an ordinance serves a substantial government interest under Renton." 121 S.Ct. at 1733. The plurality opinion, written by Justice O'Connor, found that by relying on a 1977 study showing that concentrations of adult establishments are associated with higher rates of prostitution, assaults, and other secondary effects, Los Angeles had complied with Renton's evidentiary requirement, at least for the purpose of surviving summary

---

Pap's A.M., 529 U.S. at 316-317. Justice Stevens, joined by Justice Ginsburg, dissented, concluding that the ordinance was a "patently invalid" content-based ban on nude dancing that effectively censored protected speech. Id. at 332.

judgment motion. Id. Hence the plurality held that summary judgment for the adult businesses should be reversed and the case remanded for further proceedings. Id. at 1738. The plurality explained, however, that Renton's requirement that a municipality act on evidence "reasonably believed to be relevant" to the problem of secondary effects does not mean

> . . . that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in Renton. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

Id. at 1736.[12]

Justice Kennedy concurred in the judgment of the Court but wrote separately because he agreed with the dissent that the Los Angeles ordinance was not content-neutral, and because he feared that the plurality opinion "might constitute a subtle expansion" of Renton. Id. at 1739. On the issue of content-neutrality, the O'Connor plurality took the position that the Court should not decide whether the Los Angeles ordinance was content-neutral since the Ninth Circuit had not yet

---

[12] In addition to joining the plurality opinion, Justice Scalia wrote separately to emphasize his view that the plurality's secondary effects analysis was unnecessary because the First Amendment "does not prevent those communities that wish to do so from regulating, or indeed entirely suppressing, the business of pandering sex." Id. at 1738-39.

passed on the matter. Id. at 1737. Justice Kennedy disagreed, joining the four dissenters in characterizing the application of the content-neutral label to secondary effects ordinances like Los Angeles' as a "fiction," because "whether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based. . . . These ordinances are content based and we should call them so." Id. at 1741. Nevertheless, unlike the dissent, Justice Kennedy held that secondary effects zoning ordinances were subject to intermediate scrutiny even though they were content-based. Accordingly, he concluded that "the central holding of Renton is sound: A zoning restriction that is designed to decrease secondary effects and not speech should be subject to intermediate rather than strict scrutiny." Id.

With respect to Renton, Justice Kennedy distinguished two questions entering into whether an ordinance serves a substantial government interest under Renton: (1) "what proposition does a city need to advance in order to sustain a secondary effects ordinance?", id. at 1741; and (2) "how much evidence is required to support the proposition?" Id. As Justice Kennedy saw it, the plurality gave the correct answer to the second question, but skipped the first, to which more attention must be paid. To justify a content-based zoning ordinance, he argued, "a city must advance some basis to show that its regulation has the purpose and effect

26

of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact." Id. at 1742. The key issue, in other words, is "how speech will fare" under the ordinance:

> "[T]he necessary rationale for applying intermediate scrutiny is the promise that zoning ordinances like this one may reduce the costs of secondary effects without substantially reducing speech. For this reason, it does not suffice to say that inconvenience will reduce demand and fewer patrons will lead to fewer secondary effects. . . . It is no trick to reduce secondary effects by reducing speech or its audience; but a city may not attack secondary effects indirectly by attacking speech."

Id.

Turning to the second question, Justice Kennedy agreed with the plurality that "very little evidence" was required of a municipality to support the claim that its ordinance serves to reduce secondary effects without substantially reducing speech. Id. at 1743. In this case, Los Angeles could reasonably conclude based on its 1977 study that preventing multiple adult businesses from operating under one roof was "reasonably likely to cause a substantial reduction in secondary effects while reducing speech very little." Id. Justice Kennedy acknowledged that "[i]f these assumptions can be proved unsound at trial, then the [Los Angeles] ordinance might not withstand intermediate scrutiny." Id. Nonetheless, he concluded that these considerations were sufficient to determine that the ordinance was not facially invalid and should survive a motion for summary judgment. Id. Because

he concurred in the judgment of the Court on the narrowest grounds, Justice

Kennedy's concurrence represents the Court's holding in Alameda Books under

Marks.  See, e.g., Ben's Bar, Inc., 316 F.3d 702, 722 (7th Cir. 2003) (identifying

Justice Kennedy's opinion as controlling); SOB, Inc., v. County of Benton, 317

F.3d 856, 862 n.1 (8th Cir. 2003) (same).


8. Two Types of Regulation: Zoning Ordinances and Public Nudity Ordinances

Based on the foregoing, we conclude that while the Supreme Court has

utilized closely related, and at times overlapping, analytical frameworks to evaluate

adult entertainment zoning ordinances, on the one hand, and public nudity

ordinances, on the other, these two types of regulatory action, both of which may

target the perceived "secondary effects" of adult entertainment, must be

distinguished and evaluated separately.  Zoning ordinances regulating the

conditions under which adult entertainment businesses may operate should be

evaluated under the standards for time, place, and manner regulations set forth in

Renton and reaffirmed in Alameda Books.  Accordingly, a reviewing court must

perform a three-part analysis to determine whether the zoning ordinance violates

the First Amendment: first, the court must determine whether the ordinance

constitutes an invalid total ban or merely a time, place, and manner regulation;

28

second, if the ordinance is determined to be a time, place, and manner regulation, the court must decide whether the ordinance should be subject to strict or intermediate scrutiny; and third, if the ordinance is held to be subject to intermediate scrutiny, the court must determine whether it is designed to serve a substantial government interest and allows for reasonable alternative channels of communication.  Renton, 475 U.S. at 46-50; Alameda Books, 122 S.Ct. at 1733-34.

By contrast, public nudity ordinances, insofar as they are content-neutral, should be evaluated under the four-part test for expressive conduct set forth in O'Brien and utilized by the Court in Barnes and Pap's A.M.. According to this test, public nudity ordinances that incidentally impact protected expression should be upheld if they (1) are within the constitutional power of the government to enact; (2) further a substantial governmental interest; (3) are unrelated to the suppression of free expression; and (4) restrict First Amendment freedoms no greater than necessary to further the government's interest.  O'Brien, 391 U.S. at 367-77; Pap's A.M., 529 U.S. at 289; Barnes, 501 U.S. at 567.

The significance of Alameda Books is that it clarifies how the court is to interpret the third step of the Renton analysis as well as the second prong of the O'Brien test, which are, to a certain extent, virtually indistinguishable.  In deciding whether a given ordinance "is designed to serve" (Renton) or "furthers" (O'Brien)

29

the government's alleged interest in combating the negative secondary effects associated with adult entertainment, the standard we apply is the one described in Renton and utilized in Barnes, Pap's, A.M., and Alameda Books. According to this standard, the government need not conduct local studies or produce evidence independent of that already generated by other municipalities to demonstrate the efficacy of its chosen remedy, "so long as whatever evidence [it] relies upon is reasonably believed to be relevant to the problem that [it] addresses.'" Pap's, A.M., 529 U.S. at 296 (plurality opinion) (quoting Renton, 475 U.S. at 51-52). However, the government's evidence "must fairly support [its] rationale." Alameda Books, 122 S.Ct. at 1738 (plurality opinion); see also id. at 1743 (Kennedy, J., concurring). Further, plaintiffs challenging the ordinance after passage must be given opportunity to "cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale, or by furnishing evidence that disputes the municipality's factual findings." Id.[13]

---

[13] On the basis of these Supreme Court decisions, some federal courts have expressed doubt over whether Renton or O'Brien should be used to evaluate adult entertainment ordinances and others have decided that the two tests are interchangeable. See, e.g., LLEH, Inc. v. Wichita County, Texas, 289 F.3d 358, 365 (5th Cir. 2002) (expressing uncertainty as to whether courts should use "the test for time, place, or manner regulations, described in Renton . . . or the four-part test for incidental limitations on First Amendment freedoms established in O'Brien"); Ben's Bar, Inc., 316 F.3d 702, 704 (7th Cir. 2003) (finding that "the analytical frameworks and standards utilized by the Court in evaluating adult entertainment regulations, be they zoning ordinances or public indecency statutes, are virtually indistinguishable"). Cf. Ward v. Rock Against Racism, 491 U.S. 781, 798 (1989) (stating that "in the last analysis" the O'Brien test is "little, if any, different from the standard applied to time, place, or manner restrictions"). Indeed, the District Court appears to

Having summarized these precedents, we turn now to their application to the two ordinances before us.

**B. Ordinance 98-46**

Ordinance 98-46 is not an ordinance directly regulating expressive conduct, but a zoning ordinance that imposes various physical requirements on "all adult dancing establishments" in Manatee County, including prohibiting private rooms, setting minimum levels of lighting, and requiring both an entrance room or lobby and an additional room of at least 1,000 square feet in size. The ordinance also allows the County Sheriff to search the premises of such businesses without a warrant. Because these regulations apply only to those businesses purveying a form of sexually explicit speech, they trigger First Amendment scrutiny under the line of zoning cases beginning with Young and Schad and culminating in Renton and Alameda Books. Hence a reviewing court must ask (1) whether Ordinance 98-46 constitutes a total ban, which would be impermissible, or merely a time, place and manner regulation; (2) whether, if it is a time, place, and manner regulation,

_____

have drawn a similar conclusion, since it evaluated both of Manatee County's ordinances under the four-part test outlined in O'Brien. However, based upon our review of the relevant case law, we conclude that the two types of ordinances remain distinguishable and should be evaluated separately.

31

Ordinance 98-46 should be subject to strict or intermediate scrutiny;[14] and (3) whether, if Ordinance 98-46 is held to be subject to intermediate scrutiny, it is designed to serve a substantial government interest and allows for reasonable alternative channels of communication. Alameda Books, 122 S.Ct. at 1733-34; Renton, 475 U.S. at 46-50.

Under this Court's precedent, we must apply this third step by asking whether Ordinance 98-46 is "narrowly tailored" to serve the government interest at issue and allows for reasonable alternative avenues of expression. See International Eateries of America, Inc., v. Broward County, Fla., 941 F.2d 1157, 1161-62 (11th Cir. 1991) (interpreting the third step of the Renton analysis to require narrow tailoring); Lady J. Lingerie, Inc., v. City of Jacksonville, 176 F.3d 1358, 1361 (11th Cir. 1999) (same). Additionally, in deciding whether Ordinance 98-46 is narrowly tailored to serve a substantial government interest, we must apply the evidentiary requirement described in Renton and clarified by the Court in

---

[14] Although both the Court in Renton and the plurality in Alameda Books used the labels "content-neutral" and "content-based" to characterize the second step of the Renton analysis, they did so in order to determine whether the regulations before them should be subject to intermediate or strict scrutiny. See Renton, 475 U.S. at 47-49; Alameda Books, 122 S.Ct. at 1733-34. In his Alameda Books concurrence, Justice Kennedy joined the four dissenters in jettisoning the "content-neutral" label as applied to zoning ordinances that "describe speech by content" on their face, 122 S.Ct. at 1741, but he too continued to characterize the key question in terms of levels of scrutiny, and concluded that such ordinances were subject to intermediate scrutiny even though they were content-based. Thus, the substance of Renton's second step remains unchanged after Alameda Book and properly involves determining whether an adult entertainment zoning ordinance is subject to strict or intermediate scrutiny.

Alameda Books. According to this requirement, the County, when enacting the ordinance, must have relied on evidence it "reasonably believed to be relevant" to the problem of secondary effects. Renton, 475 U.S. at 51-52. Further, the County's evidence "must fairly support [its] rationale" and plaintiffs challenging the ordinance must be given opportunity to "cast direct doubt on this rationale" with evidence of their own. Alameda Books, 122 S.Ct. at 1738.

In this case, it is unnecessary to perform the first two steps of the Renton analysis, because even if we were to decide that Ordinance 98-46 is a valid time, place, and manner regulation that is properly subject to intermediate scrutiny, the record reveals that the Manatee County Board of County Commissioners, when enacting Ordinance 98-46, failed to rely on any evidence whatsoever that might support the conclusion that the ordinance was narrowly tailored to serve the County's interest in combating secondary effects. Renton stands in part for the proposition that a municipality enacting a zoning ordinance targeting secondary effects must rely upon evidence it reasonably believes to be relevant for this purpose at the time of enactment. This is the clear implication of the Court's holding that "[t]he First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon

33

is reasonably believed to be relevant to the problem that the city addresses." Renton, 475 U.S. at 51-52 (emphasis added). Because the County failed to rely on any evidence linking the passage of Ordinance 98-46 to the prevention of secondary effects, it cannot be said that the County has satisfied even Renton's weak condition that it rely on evidence "reasonably believed to be relevant" to the problem of secondary effects or Alameda Books' condition that its evidence "fairly supports [its] rationale for enacting its ordinance." Instead, based on the record before us, we conclude that the County has not met its burden to show that Ordinance 98-46 was narrowly tailored to serve the County's interest in combating secondary effects.

Manatee County argues that it "was not required to develop a specific localized evidentiary record supporting" Ordinance 98-46 and could reasonably "rely on the evidentiary foundation set forth in prior cases" such as Barnes and Renton. Brief for Appellee, at 20. However, these statements, though accurate, do not validate the County's contention that Ordinance 98-46 withstands intermediate scrutiny. This Court has held that Renton requires at least some pre-enactment evidence. See, e.g., Ranch House v. Amerson, 238 F.3d 1273, 1283 (11th Cir. 2001) ("[S]tate actors in Defendants' position must cite to some meaningful indication–in the language of the code or in the legislative proceedings–that the

34

legislature's purpose in enacting the challenged statute was a concern over secondary effects rather than merely opposition to proscribed expression") (emphasis original); <u>Flanigan's Enterprises, Inc., v. Fulton County, Ga.</u>, 242 F.3d 976, 986 (11th Cir. 2001) (the court may not simply presume the evidence needed to sustain a secondary effects ordinance because "where the right to free speech is at issue, the government bears the burden of showing that the articulated concern has more than merely speculative factual grounds, and that it actually was a motivating factor"). To satisfy this burden, the County submitted to the District Court two large volumes of the evidence the Board relied upon when enacting both Ordinance 98-46 and Ordinance 99-18. R.1-30. All of this evidence, however, was directed exclusively toward Ordinance 99-18, the County's general nudity ordinance, and was presented to the Board only after Ordinance 98-46 was enacted. Further, Ordinance 98-46 incorporates no findings of secondary effects or references to relevant case law. Unlike Ordinance 99-18, therefore, the record reveals that the County failed to rely on <u>any</u> evidentiary foundation when enacting Ordinance 98-46.[15]

---

[15] Despite an extensive search, the only possible evidentiary basis for Ordinance 98-46 we have been able to locate in the record is a passing reference during the November 24, 1998 public hearing to a similar ordinance enacted by the City of Jacksonville, Florida, "which held up under appeal." R.1-30, Tab 4. We find this oblique, isolated reference to the ordinance at issue in <u>Lady J. Lingerie, Inc., v. City of Jacksonville</u>, 973 F.Supp. 1428 (M.D. Fla. 1997), insufficient to satisfy the County's evidentiary burden under <u>Renton</u>. As the Fifth Circuit has observed, it is not

In rejecting Appellants' constitutional challenge, the District Court expressly considered "the evidence presented to the Board at the time it enacted" Ordinances 98-46 and 99-18. However, the District Court neglected to treat the two ordinances as distinct in this regard. Instead, the District Court collapsed the two ordinances and their accompanying evidence into a single analysis. While we agree with the District Court that the County has met its initial burden under Renton to rely upon evidence it "reasonably believed to be relevant" when adopting Ordinance 99-18, the same cannot be said for Ordinance 98-48, which the record reveals was adopted without any pre-enactment evidence.

In addition to considering the evidence presented to the Board at the time it enacted the ordinances, the District Court also implied a different view toward the issue of pre-enactment evidence. Relying on the Third Circuit's decision in Phillips v. Borough of Keyport, 107 F.3d 164 (3d Cir. 1997), the District Court suggested in a footnote to its opinion that Manatee County was not required to rely on pre-enactment evidence, so long as the County was prepared to present a "factual basis for its legislative judgment . . . in court when that judgment [was]

_____

enough under Renton "simply to tailor one ordinance to another that has survived judicial review." SDJ, Inc. v. Houston, 837 F.2d 1268, 1274 (5th Cir. 1988). Instead, the County "must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact." Alameda Books, 122 S.Ct. at 1742 (Kennedy, J., concurring).

36

challenged." However, this Court has consistently interpreted <u>Renton</u> to require pre-enactment evidence, as the County's own statement of issues raised on appeal recognizes. <u>See, e.g.</u>, <u>Ranch House</u>, 238 F.3d at 1282-84; <u>Flanigan's</u>, 242 F.3d at 985-87. <u>See also</u> Brief of Appellee at 1 (stating issue as "[w]hether the District Court . . . correctly found that the ordinances were based on an adequate record before the Board of County Commissioners").[16] Moreover, we find <u>Phillips</u>' reasoning difficult to square with <u>Renton</u>, whose very language refers to pre-

---

[16] The Third Circuit appears to be an outlier on this issue. Other circuits have also interpreted <u>Renton</u> to require at least some pre-enactment evidence. <u>See, e.g.</u>, <u>D.H.L. Associates, Inc., v. O'Gorman</u>, 199 F.3d 50, 57-58 (1st Cir. 1999) (reviewing whether town considered secondary effects evidence "prior to the ordinance's enactment" to determine whether <u>Renton</u> was satisfied); <u>Hickerson v. City of New York</u>, 146 F.3d 99, 105 (2d Cir. 1998) ("a barren legislative record will not suffice under the First Amendment"); <u>11126 Baltimore Blvd. v. Prince George's County, Md.</u>, 886 F.2d 1415, 1423 (4th Cir. 1989) ("Clearly, trial testimony and 'supplemental' materials cannot sustain regulations where there is <u>no</u> evidence in the pre-enactment legislative record") (emphasis original); <u>SDJ, Inc.</u>, 837 F.2d at 1274 (5th Cir. 1988) ("We are persuaded that the City met its burden under [<u>Renton</u>] to establish that there was evidence before it from which the Council was entitled to reach its conclusion"); <u>Christy v. Ann Arbor</u>, 824 F.2d 489, 493 (6th Cir. 1987) ("Although . . . a city need not conduct new independent studies to justify adult business zoning ordinances, [we] have required some relevant evidence to demonstrate that the zoning ordinance was intended to address the secondary effects of adult businesses"); <u>Ben's Bar, Inc.</u>, 316 F.3d at 725 (7th Cir. 2003) ("In enacting the ordinance, the Village Board relied on numerous judicial decisions, studies from eleven different cities, and . . . findings . . . to support its conclusion that adult entertainment produces adverse secondary effects"); <u>SOB, Inc.</u>, 317 F.3d at 862 (8th Cir. 2003) (identifying "the fighting issue in this case" as whether the County "had sufficient evidence" of secondary effects "before enactment" to justify adopting its ordinance); <u>Tollis Inc. v. San Bernardino County</u>, 827 F.2d 1329, 1333 (9th Cir. 1987) ("The County must show that in enacting the particular limitations ... it relied upon evidence permitting the reasonable inference that, absent such limitations, the adult theaters would have harmful secondary effects"); <u>Z.J. Gifts D-2, L.L.C. v. City of Aurora</u>, 136 F.3d 683, 690 (10th Cir. 1998) (finding that a "completely barren legislative record" does not satisfy <u>Renton</u>).

37

enactment evidence, as well as with the Supreme Court's most recent treatment of this issue in Alameda Books.[17]

In sum, although Renton's evidentiary burden for the passage of a secondary effects zoning ordinance is not a rigorous one and the Supreme Court has made plain its intention to give municipalities wide latitude to design and implement solutions to problems caused by adult entertainment without compiling an extensive evidentiary record, see, e.g., Alameda Books, 122 S.Ct. at 1736-37, 1742-43, this leeway is not without limits. To satisfy Renton, any evidence "reasonably believed to be relevant"–including a municipality's own findings, evidence gathered by other localities, or evidence described in a judicial opinion–may form an adequate predicate to the adoption of a secondary effects ordinance, but the government must rely on at least some pre-enactment evidence. Because Ordinance 98-46 is deficient in this regard, we hold that the District Court erred in finding that Ordinance 98-46 as it applies to these plaintiffs on this record

---

[17] See Alameda Books, 122 S.Ct. at 1738 (resolving dispute raised by Respondents' argument that Los Angeles could not reasonably rely on post-enactment evidence, not by finding respondents' argument inapposite, as would be appropriate if Renton did not require pre-enactment evidence, but by noting that Los Angeles had, in fact, relied on pre-enactment evidence).

survives intermediate scrutiny.  We therefore reverse the District Court's grant of summary judgment to the County with respect to this ordinance.[18]

### C. Ordinance 99-18

In contrast to Ordinance 98-46, Ordinance 99-18 is a general prohibition on public nudity, not a zoning ordinance.  The ordinance regulates nudity directly, while impacting the expressive element of nude dancing only incidentally.  The Supreme Court has held that this type of government regulation, which "does not target nudity that contains an erotic message," but rather "bans all public nudity, regardless of whether that nudity is accompanied by expressive activity," is content-neutral and thus "should be evaluated under the framework set forth in O'Brien."  Pap's A.M., 529 U.S. at 289-90.  Accordingly, we must determine the constitutionality of Ordinance 99-18 as applied to the Adult Lounges by analyzing it under O'Brien's four-part test.

---

[18] The Adult Lounges argue that Ordinance 98-46 also violates the Fourth Amendment's protection against unreasonable searches, the Fifth Amendment's protection against invalid takings, the Fourteenth Amendment's protection against violations of equal protection, and the Contract Clause's protection against laws impairing the obligation of contracts.  Because we sustain the Adult Lounges' First Amendment challenge to Ordinances 98-46 we decline to address these additional claims at this time.

## 1. O'Brien's First and Third Prongs

Ordinance 99-18 easily satisfies the first and third prongs of O'Brien. The first O'Brien factor is whether the regulation is within the constitutional powers of the government. O'Brien, 391 U.S. at 376. Here, Ordinance 99-18 is within Manatee County's police powers. Pap's A.M., 529 U.S. at 296; Barnes, 501 U.S. at 567. Likewise, Ordinance 99-18 clearly satisfies the third O'Brien condition, which requires the government's interest to be unrelated to the suppression of free expression, because the ordinance bans all public nudity, not just nudity in adult dancing establishments. The Supreme Court has repeatedly held this type of general ban to be unrelated to the suppression of free expression. Pap's A.M., 529 U.S. at 296; Barnes, 501 U.S. at 567.

## 2. O'Brien's Second Prong

Under O'Brien's second prong, the County must demonstrate that Ordinance 99-18 furthers the County's substantial interest in preventing secondary effects associated with adult entertainment. To this end, the County may rely upon any evidence that is "reasonably believed to be relevant" to its interest in preventing secondary effects. Renton, 475 U.S. at 51-52. However, the County cannot rely on "shoddy data or reasoning" and its "evidence must fairly support [its] rationale."

40

Alameda Books, 122 S. Ct. at 1736.  Further, plaintiffs must be given the opportunity to "cast direct doubt on this rationale" with evidence of their own.  Id. If plaintiffs succeed in doing so, "the burden shifts back to the [County] to supplement the record with evidence renewing support for a theory that justifies its evidence."  Id. (citing Pap's A.M., 529 U.S. at 298).

Here, although Ordinance 99-18 prohibits public nudity across the board and not just nudity occurring in adult entertainment establishments, Manatee County expressly relied on its determination that public nudity "increases incidents of prostitution, sexual assaults and batteries, [and] other criminal activity" when it adopted Ordinance 99-18.  The County also relied on a report prepared by the Florida Family Association, "Evidence of Secondary Adverse Effects of Sexually Oriented Businesses," which included testimony from the sheriff of nearby Pinellas County concerning "the proliferation of prostitution, sexual contact and lewd acts that take place in nude dancing establishments in Pinellas County," and from the Director of Communicable Diseases of the Pinellas County Health Department concerning communicable diseases that "are transmitted by unprotected sexual activity that takes place in [such] establishments."  R.1-30, Tab 9.  In Pap's A.M., the Court found that a municipality's own findings and "reasonable belief that the experience of other jurisdictions is relevant to the problem it is addressing" were a

41

sufficient evidentiary basis.  529 U.S. at 297.  Hence the County's findings, and the evidence it submitted to the District Court in conjunction with its motion for summary judgment, satisfy the County's pre-enactment burden as set forth in Renton and reaffirmed in Pap's, A.M..  Id.; Renton, 475 U.S. at 51-52.

However, since the Adult Lounges have challenged the sufficiency of the County's evidence, under Alameda Books and Pap's A.M. our inquiry does not end here.  We must next determine whether the Adult Lounges have managed to "cast direct doubt" on the County's rationale for Ordinance 99-18.  Alameda Books, 122 S.Ct. at 1736 (plurality opinion) (citing Pap's A.M., 529 U.S. at 298); see also id. at 1742-44 (Kennedy, J., concurring).  Based on the evidence before us, it appears that the Adult Lounges have accomplished this task.

In response to the County's motion for summary judgment, the Adult Lounges placed into the record a two-volume "Appendix in Support of Peek-A-Boo Lounge and Temptations II's Opposition to Proposed Manatee County Public Nudity Ordinance [No. 99-18]," which it had previously submitted to the Manatee County Planning Commission during the public hearings the Commission held prior to the adoption of Ordinance 99-18.  R.1-30, Tabs 10-11.  These materials included satisfactory health and safety inspection reports of plaintiffs' businesses issued by the Florida Department of Health and the Cedar Hammock Fire

Department, R.1-30, Tab 10, at Ex. P, and Tab 11, at Ex. J; incident reports of criminal activity near the Adult Lounges and elsewhere showing lower crime rates near Appellants' businesses than in surrounding areas, R.1-30, Tab 10, at Ex. Q-S; recent sales and assessment data revealing an increase in property values for property located near Appellants' businesses, R.1-30, Tab 10, at Ex. M-N, U, and Tab 11, at Ex. K-M; and an award given in 1996 to the Peek-A-Boo Lounge by the Manatee County Sheriff for its "outstanding contribution to the community," R.1-30, Tab 11, at Ex. C.

In further response to the summary judgment motion, the Adult Lounges also submitted three expert studies specifically addressing local conditions in Manatee County which purported to show that there was no evidence connecting their businesses with negative secondary effects. Dr. Terry A. Danner, Chair of the Department of Criminology at St. Leo University, conducted a study utilizing the County's own crime statistics that examined the criminogenic effects of the Appellant's specific businesses and found that Appellants businesses did not cause such effects.[19] Dr. Randy D. Fisher, Associate Professor of Psychology and

---

[19] The research question posed by the Danner study was "whether or not there existed objective and quantifiable evidence" that Appellants' businesses "have been criminogenic businesses in such a way that their operation has resulted in a significant and sustained increase in crime volumes within the urban areas of their location." To address this question, the study utilized local crime statistics for the period 1992-1999 for seven offense types (murder, rape, robbery, aggravated assault, burglary, larceny, and motor vehicle theft) that were collected by the Manatee

Director of the Survey Research Laboratory at the University of Central Florida, prepared a study titled "Evidence for the Adverse Secondary Effects of Adult Entertainment: The Manatee County Record," which examined the record submitted by the County in support of Ordinance 99-18 and concluded that because "the only statistical data provided [in the record] showed lower rates of crime . . . [and] substantial increases in property values, both in the long run and in the shorter run, in the areas around the existing adult businesses," the specific evidence relating to the Appellants' businesses contradicted any suggestion that "the two existing adult businesses in Manatee County have 'adverse secondary effects.'"[20] Finally, Mr. Richard Schauseil, a licensed Florida real estate agent, conducted an extensive "Market Study and Report" on the effects of Appellants' businesses on

County Sheriff's office on a grid-by-grid basis for approximately 400 more-or-less uniformly sized geographic grids within the county, including those grids containing the Adult Lounges. Analyzing this data–the only such data available–by a variety of statistical measures, the Danner study concluded that "there was insufficient evidence . . . to establish a causal connection between the operation of [the Adult Lounges] and crime volumes" in their respective grids and adjoining areas.

[20] On the basis of this study, which included a comprehensive, document-by-document review of the County's pre-enactment evidence, Dr. Fisher also found that of the nineteen foreign studies contained in the Florida Family Association report–the only set of empirical studies relied upon by the County when it adopted Ordinance 99-18–only two were conducted with "any modicum of appropriate research methodology." The two exceptions were the Austin report and the Indianapolis report. The former, written in 1986 by the city of Austin's Office of Land Development Services, utilized "calls to the Austin Police Department from January 1, 1984 through December 31, 1985" and surveys "of [Austin] real estate professionals" as its database. The latter, written in 1984 by the Indianapolis Department of Metropolitan Development, also consisted only of local data that was collected by that Department from 1978 to 1982. R.1-30, Tab 9, at Ex. N-O.

neighboring properties which found that there were "absolutely no signs of any negative effects on adjoining property values or conditions" resulting from Appellants' businesses.[21]

Taken together, the Adult Lounges argue that this evidence "casts direct doubt" on the County's alleged rationale in enacting Ordinance 99-18 "by demonstrating that [the County's] evidence does not support its rationale" and "by furnishing evidence that disputes the [County]'s factual findings." Alameda Books, 122 S.Ct. at 1736. Given the record and procedural posture of this case, we are inclined to agree. Although Manatee County met its minimal initial burden under Renton to rely on evidence it reasonably believed to be relevant to addressing the problem of secondary effects, in this case Appellants have successfully cast doubt on the County's rationale by placing into the record substantial and unanswered factual challenges to the County's findings in the specific areas of crime, decreased property values, aesthetic blight, and other secondary effects.

---

[21] The Schauseil study examined real estate sales and permit histories to determine the effects of the Adult Lounges on the market values and economic viability of adjoining commercial properties. The author found steadily appreciating market values and active permit histories for properties adjacent to both of the Adult Lounges, concluding that "the sales record for the two Subject Commercial Areas has shown appreciation . . . [t]he vacancy rate and lease rate for lease space and properties offered for sale has shown a stable and viable economic area . . . [and] [t]he number of open and viable businesses in each Subject Commercial Area demonstrates strong and stable economic conditions."

In Alameda Books, the District Court granted summary judgment to the adult businesses challenging the constitutionality of a secondary effects ordinance. The Supreme Court reversed and held that the city had presented sufficient evidence to overcome a facial challenge to that ordinance. Alameda Books, 122 S.Ct. at 1738. By contrast, here summary judgment was granted to the County, and it is the adult businesses, whose constitutional challenge we understand to be an "as applied" challenge, who claim they have presented sufficient evidence to withstand that judgment. Summary judgment is appropriate, of course, only where the evidence before the court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. In making this determination, the court "must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1991). In this case, the District Court failed to draw all justifiable inferences in favor of the Adult Lounges as to the credibility and weight of their evidence, which when properly interpreted does appear to create a genuine issue of material fact under prevailing legal standards as to whether Ordinance 99-18 furthers the County's asserted interests.

Significantly, the County has not attempted to counter the Adult Lounges' evidence with local studies of its own. We are not dealing, therefore, with a case involving a battle of competing experts. Rather, as the record now stands, we have before us an ordinance adopted only on the basis of speculative findings and outdated, foreign studies whose relevance to local conditions appears questionable in light of current data Appellants have placed in the record suggesting that plaintiffs' businesses, which have operated continuously in Manatee County for over fifteen years, do not cause secondary effects. Under these circumstances, we cannot credit the County with complying with Renton's narrow tailoring requirement, which requires that a secondary effects ordinance be drawn to affect only that category of business "shown to produce the unwanted secondary effects." Renton, 475 U.S. at 52 (emphasis added). See also Flanigan's, 242 F.3d at 986-97 (finding it "unreasonable for Defendants to rely on outdated, foreign studies concerning secondary effects when the county's own current, empirical data conclusively demonstrated that such studies were not relevant to local conditions," especially where adult businesses were not "a recent addition to Fulton County neighborhoods" but "have continually operated . . . for nearly a decade"); id at 987 (affirming that "the constitutionality of an ordinance will depend on local conditions").

We note that the fact that the Adult Lounges have managed, in their "as applied" challenge, to cast doubt on the County's basis for enacting Ordinance 99-18 does not mean the ordinance could not ultimately survive intermediate scrutiny. Rather, under Alameda Books, at this point summary judgment is inappropriate and "the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance." Alameda Books, 122 S.Ct. at 1736 (plurality opinion) (citing Pap's A.M., 529 U.S. at 298); see also id. at 1742-44 (Kennedy, J., concurring). Thus, the County must be given the opportunity to supplement the record in this manner, and the District Court, which did not have the benefit of Alameda Books when it granted the County's motion for summary judgment, should consider any additional evidence in the first instance.

At trial, in keeping with Alameda Books' burden-shifting analysis, the District Court must determine whether the County's additional evidence "renew[s] support for a theory that justifies its ordinance." 122 S.Ct. at 1736. Stated otherwise, in light of our finding that the Adult Lounges have managed to cast direct doubt on the County's rationale for adopting Ordinance 99-18, the District Court must decide by a preponderance of the available evidence (including whatever additional evidence the County places in the record) whether there remains credible evidence upon which the County could reasonably rely in

48

concluding that the ordinance would combat the secondary effects of adult entertainment establishments in Manatee County. The burden lies with the County in this regard. However, the District Court should be careful not to substitute its own judgment for that of the County. The County's legislative judgment should be upheld provided that the County can show that its judgment is still supported by credible evidence, upon which the County reasonably relies.

3. O'Brien's Fourth Prong

O'Brien's fourth prong requires that any incidental restriction on alleged First Amendment freedoms be no greater than is essential to further the government's interest. O'Brien, 391 U.S. at 376. In Pap's A.M., the Court upheld a public nudity statute that permitted erotic dancers to wear at least pasties and a G-string, holding that it satisfied this part of the O'Brien test. 529 U.S. at 301. The Court also upheld a similar statute in Barnes. 501 U.S. at 570, 587. Here, however, Manatee County went beyond the regulations at issue in Pap's A.M. and Barnes, according to which pasties and a G-string are sufficient to distinguish a state of lawful dress from unlawful nudity. Instead, the County has defined "nudity" more expansively to encompass the wearing of any clothing covering less

49

than one-third of the buttocks or one-fourth of the female breast.[22]  The County has also expressly forbidden the wearing of "G-strings, T-backs, dental floss, and thongs."  In other words, the County has effectively redrawn the boundary between nudity and non-nudity, thereby prohibiting erotic dancers from wearing the amount of body covering the Court found to be consistent with the First Amendment in Pap's A.M. and Barnes.

The question we face is whether the County's prohibition, which presumably impacts the expressive component of erotic dancing, is no greater than essential to further the County's interest in preventing secondary effects.  In Pap's A.M., the Court determined that this issue required the balancing of competing interests, and it concluded that a pasties and G-string requirement survived intermediate scrutiny because it "leaves ample capacity to convey the dancer's erotic message."  529 U.S. at 301.  The Court further emphasized that:

> [E]ven if Erie's public nudity ban has some minimal effect on the erotic message by muting that portion of the expression that occurs when the last stitch is dropped, the dancers at Kandyland and other such establishments are free to perform wearing pasties and G-strings.  Any effect on the overall expression is de minimis.

Id; see also id. at 294.

Applying these considerations to Ordinance 99-18, we think it significant

---

[22] See supra note 2.

that the Supreme Court has emphasized that local governments "'must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.'" Id. at 301 (quoting Renton, 475 U.S. at 52). Nevertheless, we find it difficult to conclude on this record that preventing erotic dancers from wearing G-strings, thongs, pasties and the like has only a "de minimis" effect on the expressive component of erotic dancing or "leaves ample capacity to convey the dancer's erotic message." Id. On the contrary, because erotic dancers in Manatee County are not "free to perform wearing pasties and G-strings," id., arguably, the County's prohibition could significantly impact that message.

This concern about the scope of Ordinance 99-18, although raised squarely by the Adult Lounges, has not yet been adequately addressed either by the Defendants or by the District Court. Because of the importance of this issue, we are reluctant to rule without further argument from the parties and findings by the District Court. On remand, therefore, the parties and the District Court should also consider whether Ordinance 99-18 would fail under intermediate scrutiny because it proscribes too much protected expression and fails to preserve "ample capacity to convey the dancer's erotic message." 529 U.S. at 301. Cf. Ranch House, 238 F.3d at 1285-86 (11th Cir. 2001) (remanding under similar circumstances with specific

guidance to the District Court as to O'Brien's fourth prong).[23]

In sum, we hold that the District Court erred by granting summary judgment to the County as to Ordinance 99-18. We therefore reverse the court's order with respect to this ordinance as well.[24]

## IV. CONCLUSION

The District Court granted summary judgment to Defendants on all grounds with respect to both Ordinance 98-46 and Ordinance 99-18. For the foregoing reasons, we REVERSE the grant of summary judgment on the Plaintiffs' First Amendment freedom of expression claims with respect to both ordinances and REMAND the case to the District Court for further proceedings consistent with this opinion.

---

[23] The County argues that Café 207, Inc., v. St. John's County, 66 F.3d 272 (11th Cir. 1995), which affirmed and adopted the reasoning of a trial court judgment validating a similar ordinance, requires us to uphold Ordinance 99-18. See Café 207, Inc., v. St. John's County, 856 F. Supp. 641 (M.D. Fla. 1994). However, Café 207 was decided before Pap's A.M., where the Supreme Court clarified for the first time that nudity ordinances must leave ample capacity for erotic dancers to convey their erotic message, and Alameda Books, in which Justice Kennedy's controlling opinion emphasized that secondary effects ordinances must accomplish their goal of combating secondary effects "while leaving the quantity and accessibility of speech substantially intact." 122 S.Ct. at 1742.

[24] The Adult Lounges also contend that Ordinance 99-18 is unconstitutionally overbroad, in that it sweeps within its ambit protected speech of persons not before the Court; and unconstitutionally vague, in that it fails to adequately define its operative phrases, thus leaving persons of common intelligence to guess as to the ordinance's meaning and differ as to its application. However, since we reverse the District Court's grant of summary judgment with respect to Ordinance 99-18 on independent grounds, we need not decide these issues at this time. For the same reason, we decline to address the Adult Lounges' additional claims that Ordinance 99-18 violates the Fifth Amendment, the Contract Clause, and various provisions of Florida law.

EDMONDSON, Chief Judge, concurs in the result.