[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 16, 2010
JOHN LEY
CLERK

_____

No. 08-17035

_____

D. C. Docket Nos. 01-03109-CV-RLV-1,
01-03696-CV-RLV

FLANIGAN'S ENTERPRISES, INC. OF GEORGIA,
a Georgia corporation d.b.a. Mardi Gras,
6420 ROSWELL RD., INC.,
a Georgia corporation d.b.a. Flashers, et al.,

Plaintiffs-Appellees-Cross Appellants,

versus

FULTON COUNTY, GA.,

Defendant-Appellant-Cross Appellee.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(February 16, 2010)

Before BLACK, MARCUS and HIGGINBOTHAM,[*] Circuit Judges.

MARCUS, Circuit Judge:

_____

[*] Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit, sitting by designation.

Defendant Fulton County, Georgia, concerned about the secondary effects on its communities of the mixture of alcohol and live nude dancing, passed an ordinance in 2001 prohibiting the sale, possession, and consumption of alcohol in adult entertainment establishments. Plaintiffs Flanigan's Enterprises, Inc., owner and operator of the Mardi Gras strip club, and other owners and operators of strip clubs in Fulton County brought this First Amendment challenge to the ordinance, arguing that the ordinance infringed on their right to free speech. The district court, concluding that the ordinance failed to further an important governmental interest, granted summary judgment and awarded damages to Flanigan's. The County now appeals the judgment and Flanigan's cross-appeals on several issues not reached by the district court.

This is the second time that we have been asked to consider a First Amendment challenge to a Fulton County ordinance proscribing the sale of alcohol at adult clubs. The County had passed a similar ordinance in 1997, but this Court struck it down, reasoning that the County had ignored the most relevant evidence in enacting the regulation. See Flanigan's Enters., Inc. of Ga. v. Fulton County, Ga., 242 F.3d 976, 986 (11th Cir. 2001). This case is different. This time around, the County relied on ample statistical, surveillance, and anecdotal evidence, the live testimony of the chief of police and the chief judge of the juvenile court,

among others, and dozens of foreign studies, all of which support the County's efforts to curb the negative secondary effects of alcohol and live nude dancing in its communities. We are satisfied that the County's reliance on this factual foundation was reasonable, and because we determine that the ordinance furthers an important governmental interest, we reverse.

## I.

### A.

The essential facts presented in this summary judgment record are these: the plaintiffs in this consolidated action -- Flanigan's Enterprises, Inc. ("Flanigan's"); 6420 Roswell Road, Inc. ("Roswell"); Harry Freese; Fannies, Inc.; William H. Parks, Jr.; and Ceeda Enterprises, Inc. ("Ceeda") (collectively, "the clubs") -- are owners and operators of strip clubs in Fulton County, Georgia. The clubs they operate include Mardi Gras, Flashers, Fannies, and Riley's Restaurant and Lounge ("Riley's"). These clubs sell and serve alcohol, and feature live nude dancing on the premises.

In 1997, Fulton County began to investigate the impact of strip clubs within its borders on crime and property values in the surrounding communities. The County board of commissioners directed the police department to study the issue, which the department did. The resulting police investigation, which considered

two and a half years of statistical data, revealed no relationship between alcohol, nude dancing, and crime. In fact, the report suggested that crime was a greater problem in and around bars which did not feature live nude dancing. In response to the County's investigation, the strip clubs commissioned a study of their own, which revealed that there was no relationship between the strip clubs and reduced property values in Fulton County.

The County's investigation continued. It, too, commissioned a study on property values in the area, which confirmed the finding of the clubs' study -- that the clubs had no impact on the property values in the surrounding areas. The County also directed its staff to collect a number of studies on the impact of strip clubs in other American cities. These so-called foreign studies, which considered the impact of clubs in Austin, Indianapolis, Minneapolis, and Los Angeles, concluded that strip clubs were indeed a blight on the surrounding communities.

The County held two public meetings to review the results of its investigation. Despite the three local and recent studies indicating no relationship between the clubs, crime, or reduced property values, the County relied on the foreign studies indicating a correlation. As a result, on December 17, 1997, the board of commissioners passed an ordinance forbidding the service and consumption of alcohol in facilities featuring adult entertainment.

4

The strip clubs sued, and a panel of this Court determined that the ordinance violated the First Amendment of the U.S. Constitution. Relying on United States v. O'Brien, 391 U.S. 367 (1968), the Court observed that the County was "not required to perform empirical studies," but, "having done so, the Board [could not] ignore the results." Flanigan's Enters., Inc. of Ga. v. Fulton County, Ga., 242 F.3d 976, 986 (11th Cir. 2001) (internal citation omitted).

After this Court struck down the first ordinance, the board commissioned two more studies. The first of these studies, called "Adult and Non-Adult Entertainment Establishments Statist[i]cal Analysis From 1/1/98 To 12/31/00," conducted by the Fulton County police department, and completed in March 2001 ("March 2001 report" or "Adult and Non-Adult Entertainment Establishments Statistical Analysis"), reviewed police data from January 1998 to December 2000. It found "that adult entertainment establishment[s which] served alcoholic beverages did not have a significant impact on the police department as it relates to an increase in calls for police service, nor an increase in crime as a secondary [e]ffect." Moreover, the March 2001 report concluded that bars without nude dancing had higher crime rates than those bars with nude dancing.

The second of the studies commissioned by the County was completed in July 2001 ("July 2001 report"), made a variety of findings, and reached a different

result. Titled "Report on Fulton County Adult Entertainment Businesses," it described "Operation Summit Up," a fourteen-day sweep conducted by the Fulton County police department in September 1998. The sting operation, which focused on an industrial area in which the strip clubs Fannies, Riley's and Babes were located, resulted in 167 arrests and 166 convictions. Of the 221 total charges filed, ninety-three were for prostitution and other sex-related crimes, and thirty-four were for drug-related crimes.

The report featured photographic evidence chronicling the same industrial area, and stated that the area was marked by dilapidated buildings, streets in disrepair, and cheap hotels catering to prostitutes and johns. An affidavit from Patrick Stafford, executive director of the Fulton Industrial Business Association, further described the hotels, stating that "[t]hey rent locally, engage in cash transactions with customers, and rent hourly or for portions of days," and that their exteriors are characterized by "out-of-code parking lots, lack of lighting in parking lots, lack of security in parking lots, pandering and general unsafe conditions."

Notably, the July 2001 report contained an extensive discussion of South Fulton Precinct beats 21 and 23, and, in particular, a one square-mile of land within them called grid B43. Grid B43 contains three of the nude clubs, Fannies, Riley's, and Babes. The report stated that, from 1998 to 2000, beats 21 and 23 accounted

6

for a disproportionately high amount of crime within the South Fulton Precinct, and that grid B43 contributed to more than its fair share of crime within those two beats. The report noted that beats 21 and 23 saw an increase in crime during the evening hours, even though most businesses in the area operated during standard business hours. The report also compared incident data from six strip clubs, five of which served alcohol and one of which did not (but allowed customers to bring their own) ("the BYOB club"). It showed that, from 1998 to 2000, the BYOB club accounted for only fifteen of the 362 reported incidents, or 4.1%.

The report described in great detail the results of surveillance operations conducted by the Fulton County police during May and June of 2001. The surveillance conducted at the adult clubs which served alcohol revealed a number of criminal violations and arrests.[1] The report states, however, that no violations

---

[1] On two occasions, undercover officers videotaped dancers and patrons at the strip clubs, concluding that the "videotapes evidence gross violations of the ordinance governing such establishments as they graphically depict contact between dancers and patrons openly and, in some incidences, behind closed-in areas." An analysis of approximately two hours of tape revealed thirty-nine violations of law, which included fondling, caressing, tips other than hand to hand, and dancing someplace other than a fixed stage. See Fulton County, Ga., Code § 18-79(8-10) (2001) (prohibiting those activities). The tape also revealed violations of the Georgia criminal law against masturbation for hire. See O.C.G.A. § 16-6-16(a) ("A person, including a masseur or masseuse, commits the offense of masturbation for hire when he erotically stimulates the genital organs of another, whether resulting in orgasm or not, by manual or other bodily contact exclusive of sexual intercourse or by instrumental manipulation for money or the substantial equivalent thereof."); see also id. § 16-6-16(b) (defining masturbation for hire as a misdemeanor). Non-video surveillance revealed the same unlawful behavior and described a number of arrests. One passage reads this way:

At **Flasher's** two undercover officers observed a dancer dancing for a customer.

were observed, and no arrests were made, at the BYOB club.

The report also presented what it described as anecdotal evidence. An affidavit from the Honorable Nina R. Hickson, presiding judge for the Juvenile Court of Fulton County, described how some of the girls who had appeared before her in her two years as presiding judge had worked in the adult clubs and had performed sexual acts in their parking lots. Some of these girls got work at private parties, where they performed sexual acts. Judge Hickson also reported her "belief that adult entertainment clubs are a burden on the juvenile justice system." The July 2001 report also contained excerpts from a number of newspaper articles from 1998 to 2001 describing the strip clubs and their negative impact on the community. The articles discuss the clubs, crime, child prostitution, and the prosecution at the Gold Club, an area club of ill repute now closed.

Appended to the July 2001 report were a number of foreign studies, which considered data from and the experiences of a variety of American cities. In

---

After getting entirely naked, she pushed her breasts together and rotated them, making contact with the customer's face. This dancer then turned around, squatted and rotated her body into the customer's groin area. The customer later passed an undetermined amount of money to the dancer. A second dancer at Flasher's was observed by the officers committing the same acts with another customer -- pushing her breasts into the customer's face, grinding into his groin area then receiving money. **Both of these dancers were arrested and charged with masturbation for hire** . . . .

The underlying documentation recounted a number of similar scenes.

8

particular, the July 2001 report included a summary produced by the National Law

Center for Children and Families ("NLC") of studies of the negative secondary

effects of sexually oriented businesses across America.[2]  The studies tended to

show that sexually-oriented businesses, including strip clubs and adult book stores,

had harmful secondary effects on their surrounding communities.  Specifically, the

foreign studies documented increased crime rates and reduced property values in

the neighborhoods near strip clubs.  In fact, of the twenty-eight studies discussed in

the NLC report -- studies that had not been presented to this Court when we

reviewed the County's earlier ordinance in <u>Flanigan's Enterprises, Inc. of Georgia

v. Fulton County, Georgia</u>, 242 F.3d 976 (11th Cir. 2001) -- thirteen of them

suggested that there was a correlation between adult clubs and depressed property

values.[3]

---

[2] The jurisdictions studied were: (1) Phoenix, Ariz., (2) Tuscon, Ariz., (3) Garden Grove, Cal., (4) Los Angeles, Cal., (5) Whittier, Cal., (6) Adams County, Colo., (7) Manatee County, Fla., (8) Indianapolis, Ind., (9) Minneapolis, Minn., (10) St. Paul, Minn., (11) Las Vegas, Nev., (12) Ellicottville, N.Y., (13) Islip, N.Y., (14) New York, N.Y., (15) Times Square, N.Y., (16) New Hanover County, N.C., (17) Cleveland, Ohio, (18) Oklahoma City, Okla., (19) Oklahoma City, Okla. (a second study), (20) Amarillo, Tex., (21) Austin, Tex., (22) Beaumont, Tex., (23) Cleburne, Tex., (24) Dallas, Tex., (25) El Paso, Tex., (26) Houston, Tex., (27) Houston, Tex. (a second study), (28) Newport News, Va., (29) Bellevue, Wash., (30) Des Moines, Wash., (31) Seattle, Wash., and (32) St. Croix County, Wis.

[3] The studies positing such a correlation were these: (1) Garden Grove, (2) Whittier, (3) St. Paul, (4) Las Vegas, (5) New York, (6) Times Square, (7) Oklahoma City, (8) Dallas, (9) El Paso, (10) Houston, (11) Newport News, (12) Des Moines, and (13) Seattle.  Of these thirteen studies, six relied on some sort of statistical evidence (Whittier, St. Paul, Las Vegas, New York, Times Square, and El Paso), while the rest premised their findings on anecdotal evidence, for instance, telephone surveys of real estate appraisers or community residents (Garden Grove,

9

For instance, the NLC report summarized the results of a 1988 study of sexually oriented businesses in Adams County, Colo. It "concluded that there was a clearly demonstrated rise in crime and violence, and an increase in the attraction to transients to the area as a result of nude entertainment establishments." In particular, the Adams County crime statistics showed that, in one area featuring two adult establishments, 83% of all crimes occurring in 1987 were linked to the adult businesses, and half involved alcohol. In another area featuring five adult businesses, 65% of crimes committed in 1987 involved alcohol.

A 1979 study of sexually oriented businesses in Phoenix, Ariz., found that "the number of sex offenses was 506% greater in neighborhoods where sexually oriented businesses were located." These sex crimes included indecent exposure, rape, lewd and lascivious behavior, and child molestation. Property crimes and violent crimes were elevated as well (43% and 4%, respectively). A 1994 study conducted in New York "showed that concentration of [sexually oriented businesses] had resulted in significant negative impacts, including economic decline, decreased property values, and deterrence of customers, and significantly increased crime incidence." Likewise, the Newport News study, conducted in 1996, drew this conclusion: "When adjusted for population differences, the study

Oklahoma City, Dallas, Newport News, and Des Moines), public complaints filed by local citizens (Seattle), or live testimony (Houston).

10

area had 57% higher police calls and 40% higher crimes than the control area."

The July 2001 report also reproduced two foreign studies in their entirety, both of which had been summarized in the NLC report. The first of these studies considered Houston in 1997 and made a variety of findings. It stated that "lewd behavior [and] sexual contact" was occurring at adult entertainment establishments, but that much of the criminal activity was obscured by secluded areas, dim lighting, and private rooms. Moreover, the Houston police had difficulty investigating crime in the clubs because the refusal of undercover vice officers to "engage in inappropriate behavior (such as removing their clothing)" led strip club employees to assume that they were dealing with the police, thereby curtailing any ongoing or pending criminal behavior.

The other complete foreign study considered Ellicottville, N.Y. Ellicottville did not have any adult businesses in 1998, but the town decided to take a "preemptive approach" to try to "maintain[] the character of the community as a family oriented recreation destination" and stave off the negative secondary effects associated with adult businesses. After surveying a variety of other jurisdictions,[4] the Ellicottville study concluded that the negative secondary effects of adult businesses "include[d] crime, decreased market values, public resentment, a

_____

[4] The Ellicottville study considered foreign studies from (1) New York, N.Y., (2) Islip, N.Y., and (3) Hyde Park, N.Y.

11

general blighting of the commercial district and a negative influence upon community character." The report recommended adopting zoning amendments in order to keep the adult businesses out.

On July 18, 2001, Fulton County held another public hearing at which it received the 337-page July 2001 report, and heard live testimony. George Coleman, the chief of police, testified, largely summarizing the criminal findings contained in the July 2001 report. He concluded: "Investigation conducted by the Fulton County Police Department ha[s] resulted in the documentation of various criminal activities occurring both inside and in the outer vicinity of the adult entertainment establishments located within unincorporated Fulton County." Judge Hickson likewise summarized material from the report, concluding, "we are seeing a number of our children involved in the illicit activities through the adult entertainment industry where there is alcohol served and that it does have a negative impact upon the juveniles that I'm seeing in my court on a regular basis." Patrick Stafford testified about the impact of the clubs on the business district. He said of the strip clubs,

> They are not productive. They aren't helping us. The alcoholic beverages served in those establishments lead to secondary approaches to those folks going and doing criminal activity. Those folks moving on and doing things in hotels that accept lots of cash. Stop those predators. Help our image. Help the existing businesses. Help enhance the area of economic vitality. Help this County by

12

passing this resolution.

The County then heard testimony from two County residents in support of the ordinance. Eva Galantos stated that she had "lived with an abomination of one of these clubs in the heart of Sandy Springs for more years than I care to recall," and Graddie Tucker said that the proposed ordinance was "a long time coming." Two lawyers from a pair of clubs (one of which is a plaintiff in this action) then spoke out against the ordinance.

The County, on August 15, 2001, passed a resolution to adopt the adult entertainment establishment ordinance at issue today. The resolution contained a number of findings. It stated "that nudity and sexual conduct and depiction thereof, coupled with alcohol in public places, encourages undesirable behavior and is not in the interest of public health, safety and welfare." Elaborating, the County found "that public nudity and depictions thereof, under certain circumstances, begets criminal behavior and tends to create undesirable community conditions such as community blight and property deterioration." In support of this proposition, it cited the testimony received at the public hearing, the July 2001 report, the findings incorporated in a number of court cases,[5] and the "experience

---

[5] The cases cited were Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991); City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986); Young v. American Mini Theatres, Inc., 427 U.S. 50 (1976); and Blue Canary Corp. v. City of Milwaukee, 251 F.3d 1121 (7th Cir. 2001).

of other urban counties and municipalities." The board further found that, included

> among the undesirable community conditions identified with live nude entertainment are depression of property values in the surrounding neighborhood, increased expenditure for the allocation of law enforcement personnel to preserve law and order, [and] an increased burden on the judicial system as a consequence of the criminal behavior.

The board adopted the ordinance, which provided, among other things, that "[n]o alcoholic beverages of any kind shall be sold, possessed or consumed on the premises of an adult entertainment establishment." Fulton County, Ga., Code § 18-79(17) (2001).[6]

---

[6] The ordinance defined "adult entertainment establishment" to

> mean[] the premises of any facility upon which an adult entertainment business or adult bookstore operates or upon which such defined activities occur. The definition of an adult entertainment establishment shall not apply to nor prohibit the live performance of legitimate plays, operas, ballets, or concerts at a concert house, museum, or educational institution or facility holding an alcoholic beverage license, which derives less than 20 percent of its gross receipts from the sale of alcoholic beverages.

Fulton County, Ga., Code § 18-78(3) (2001). It further stated that

> "Adult entertainment" means the permitting, performing, or engaging in live acts:
>
> a. Of touching, caressing, or fondling of the breasts, buttocks, anus, vulva, or genitals;
>
> b. Of displaying of any portion of the areola of the female breast or any portion of his or her pubic hair, cleft of the buttocks, anus, vulva, or genitals;
>
> c. Of displaying of pubic hair, anus, vulva, or genitals; or

B.

On November 21, 2001, Flanigan's, Roswell, Freese, Fannies, and Parks sued the County and its commissioners in the Northern District of Georgia under 42 U.S.C. § 1983, seeking injunctive relief, a declaratory judgment, damages, and fees. They asserted that this ordinance, like the earlier version, violated their rights under the First and Fourteenth Amendments of the U.S. Constitution. Ceeda sued the County as well, and the cases were consolidated in February of 2002.

The defendant commissioners moved for summary judgment, asserting absolute and qualified immunity. The court determined that the commissioners were entitled to absolute legislative immunity (without reaching the question of qualified immunity) and granted the motion. See Order at 4, Flanigan's Enters., Inc., of Ga. v. Fulton County, Ga., No. 1:01-CV-3109-RLV (N.D. Ga. Dec. 3, 2002).

The defendant County also moved for summary judgment, and in an order on April 7, 2004, the district court denied the motion. Relying on Flanigan's and O'Brien, it held that the ordinance did not further an important governmental interest. See Order at 18, Flanigan's Enters., Inc., of Ga. v. Fulton County, Ga.,

_____

d. Which simulate sexual intercourse (homosexual or heterosexual), masturbation, sodomy, bestiality, oral copulation, or flagellation.

Id. § 18-78(2).

15

No. 1:01-CV-3109-RLV (N.D. Ga. Apr. 7, 2004). Specifically, it found that the March 2001 report, which found no relationship between the clubs and crime, was "[t]he most probative evidence regarding the secondary effects of adult entertainment establishments." Id. at 15-16. The court noted, conversely, that the July 2001 report was filled with "extensive anecdotal evidence." Id. at 17. It therefore concluded "that it was unreasonable to ignore the most relevant local study in favor of a less comprehensive study and foreign studies." Id. at 17-18. Because the court denied the defense motion under O'Brien, it did "not address the plaintiffs' other arguments as to why the ordinance is unconstitutional." Id. at 18.

The district court also criticized the behavior of the County. It stated, "the court is somewhat skeptical of these self-serving investigations in which the police officers are no doubt aware of the defendant's desired result. It is unclear whether the police investigations on the two dates in May and June 2001 were conducted only after the March 2001 [study] failed to achieve the desired result." Id. at 17. It further chastised the County for its failure to disclose the March 2001 report: "The court is somewhat troubled by the fact that it appears that this report was withheld from the plaintiffs until less than one week prior to the date on which the vote on the ordinance was scheduled." Id. at 16.

The plaintiffs subsequently moved for summary judgment, and the district

16

court, stating that it saw no reason to change its view of the case, granted the motion.  See Order at 6-7, Flanigan's Enters., Inc., of Ga. v. Fulton County, Ga., No. 1:01-CV-3109-RLV (N.D. Ga. Oct. 12, 2006).  It again said that it would not address the plaintiff's other arguments as to why the ordinance was unconstitutional.  See id. at 9-10.  The court subsequently awarded damages to the clubs.  Order at 2, Flanigan's Enters., Inc., of Ga. v. Fulton County, Ga., No. 1:01-CV-3109-RLV (N.D. Ga. Nov. 13, 2008).

The County timely appealed and the clubs timely cross-appealed.

## II.

"We review a district court's grant of summary judgment de novo, applying the same standards as the district court."  Flanigan's Enters., Inc. of Ga. v. Fulton County, Ga., 242 F.3d 976, 982 (11th Cir. 2001) (emphasis added) (citing Harris v. H&W Contracting Co., 102 F.3d 516, 518 (11th Cir. 1996)).  "We will affirm the district court if the record demonstrates there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Id. (citing Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990)).

This Court and the Supreme Court have "explained that 'the reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and we must thus decide for ourselves whether a given course of conduct falls on the near

17

or far side of the line of constitutional protection.'" ACLU of Florida, Inc. v. Miami-Dade County Sch. Bd., 557 F.3d 1177, 1205 (11th Cir. 2009) (quoting Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 567 (1995)).

> Therefore, the conclusion of law as to a Federal right and [the] finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts. In such cases, the Supreme Court has instructed us to make an independent examination of the whole record, and has recognized our ultimate power . . . to conduct an independent review of constitutional claims when necessary.

Id. at 1206 (quotation marks and internal citations omitted) (alterations in original) (quoting Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 506, 508 & n.27 (1984)). This "constitutional responsibility . . . cannot be delegated to the trier of fact." Id. (quoting Bose, 466 U.S. at 501); see also Flanigan's, 242 F.3d at 986-87 ("[O]ur decision today appears to result in constitutional fact finding . . . . However, we have no choice.").

Our review of the district court's factfinding is, accordingly, mixed. "Ordinarily, we review district court factfindings only for clear error, but First Amendment issues are not ordinary. Where the First Amendment Free Speech Clause is involved our review of the district court's findings of 'constitutional facts,' as distinguished from ordinary historical facts, is de novo." ACLU v.

Miami-Dade, 557 F.3d at 1203 (citing CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1268 (11th Cir. 2006)) (additional citations omitted).

Historical facts "are facts about the who, what, where, when, and how of the controversy," id. at 1206, and we review them for clear error. "By contrast, under the assumptions about the law that we [make] for purposes of deciding this case, we must determine the 'why' facts. Those are the core constitutional facts that involve the reasons the [defendant] took the challenged action." Id. at 1206; see also Daytona Grand, Inc. v. City of Daytona Beach, Fla., 490 F.3d 860, 870-71 (11th Cir. 2007) ("[T]he district court's methodology in making that calculation -- such as whether a particular site is 'available' and provides a reasonable avenue for communicating an adult business's erotic message -- is a legal determination that we review de novo."). We find these core constitutional facts -- the "why" facts -- "as though the district court had never made any findings about them." ACLU v. Miami-Dade, 557 F.3d at 1207.

### III.

Nude dancing is a form of expression protected by the First Amendment. See Krueger v. City of Pensacola, 759 F.2d 851, 854 (11th Cir. 1985); Flanigan's, 242 F.3d at 985 n.12. "To determine what level of scrutiny applies, we must decide whether the State's regulation is related to the suppression of expression. If

19

the governmental purpose in enacting the regulation is unrelated to the suppression of expression, then the regulation need only satisfy intermediate scrutiny under O'Brien." Flanigan's, 242 F.3d at 983 (citing City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000)).

"[A] city ordinance prohibiting nude dancing in establishments licensed to sell liquor is content-neutral and therefore, subject to review under the O'Brien test." Id. (citing Sammy's of Mobile, Ltd. v. City of Mobile, 140 F.3d 993, 996 (11th Cir. 1998), cert. denied, 529 U.S. 1052 (2000)). This is the case because the goal of such regulation is not the curtailment of protected expression: "regulations targeting undesirable secondary effects of adult entertainment establishments that serve alcoholic beverages are unrelated to the suppression of the erotic message conveyed by nude dancing." Id. at 984 (citing Artistic Entm't, Inc. v. City of Warner Robins, 223 F.3d 1306, 1309 (11th Cir. 2000)). Rather, these ordinances attempt to insulate the communities surrounding the adult entertainment establishments from the undesirable elements that tend to accompany those businesses. They are, at their core, social and economic regulations aimed at improving communities and promoting health, safety and welfare.

The Fulton County ordinance considered today does not prohibit nude dancing. Rather, it prohibits the sale, possession and consumption of alcoholic

20

beverages "on the premises of an adult entertainment establishment."  Fulton

County, Ga., Code § 18-79(17) (2001).  The ordinance is content neutral and its

enactment is unrelated to the suppression of speech.  We, therefore, subject it to

intermediate review under United States v. O'Brien, 391 U.S. 367 (1968).  "Under

O'Brien, an ordinance is valid if: (1) it serves a substantial interest within the

power of the government; (2) the ordinance furthers that interest; (3) the interest

served is unrelated to the suppression of free expression; and (4) there is no less

restrictive alternative."  Flanigan's, 242 F.3d at 984 (citing O'Brien, 391 U.S. at

377).

Three of the four prongs of the O'Brien test are not at issue in this case.  The

first prong -- a substantial interest within the power of government -- is easily met

here.  "It has been by now clearly established that reducing the secondary effects

associated with adult businesses is a substantial government interest 'that must be

accorded high respect.'"  Daytona Grand, Inc. v. City of Daytona Beach, Fla., 490

F.3d 860, 873-74 (11th Cir. 2007) (quoting City of L.A. v. Alameda Books, Inc.,

535 U.S. 425, 444 (2002) (Kennedy, J., concurring in the judgment)[7]); see also

Flanigan's, 242 F.2d at 984 ("Such interests are substantial government interests

---

[7] Justice Kennedy's concurrence in City of Los Angeles v. Alameda Books, Inc., 535
U.S. 425 (2002), is considered to be the holding in the case.  See Daytona Grand, Inc. v. City of
Daytona Beach, Fla., 490 F.3d 860, 874 n.20 (11th Cir. 2007) (citing Peek-A-Boo Lounge of
Bradenton, Inc. v. Manatee County, Fla., 337 F.3d 1251, 1264 (11th Cir. 2003)).

that satisfy the first part of the O'Brien test.") (emphasis added) (citing Pap's, 529 U.S. 277).

In their resolution to adopt the ordinance, the board of commissioners eleven times discussed the negative secondary effects of live nude dancing.[8] Moreover, the ordinance itself states its purpose in the preamble:

> The purpose of this Article is to regulate adult entertainment establishments with the intention that, through this ordinance, many types of criminal activities frequently engendered by such businesses and the adverse effect on property values and on the public health, safety, and welfare of the County, and on its citizens and property, and on the character of its neighborhoods and development, will be curtailed and/or prevented. . . . This Article is intended to represent a balancing of competing interests: reduced criminal activity and protection of neighborhoods and development through the regulation of adult entertainment establishments versus any legally protected rights of adult entertainment establishments and patrons.

Fulton County, Ga., Code § 18-76. Without question, Fulton County passed this ordinance out of a concern over the secondary effects of alcohol and live nude dancing on the community. These effects are, specifically, increased criminal activity, decreased property values, and urban blight and decay generally. It is undeniable that the government has a substantial interest in curtailing such effects.

---

[8] The board used different phrasing at different junctures. Its references to the secondary effects were: (1) "undesirable behavior," (2) "disturbances," (3) "undesirable secondary effects," (4) "undesirable secondary effects," (5) "negative secondary effects," (6) "criminal behavior and . . . undesirable community conditions," (7) "criminal behavior and . . . undesirable community conditions," (8) "undesirable community conditions," (9) "crime and . . . property values," (10) "undesirable secondary effects," and (11) "undesirable secondary effects."

The third prong of the O'Brien test -- regulation unrelated to the suppression of free expression -- is easily met. Both this Court and "the Supreme Court have expressly held that an ordinance focusing on the secondary effects associated with the combination of nude dancing and alcohol consumption is unrelated to the suppression of free expression." Flanigan's, 242 F.2d at 984 (citing Pap's, 529 U.S. at 293, and Wise Enters., Inc. v. Unified Gov't of Athens-Clarke County, Ga., 217 F.3d 1360, 1364 (11th Cir. 2000)). As the prior analysis demonstrates, this ordinance focuses on the secondary effects associated with alcohol and live nude dancing. Moreover, the board of commissioners said that it was not its intent "to deny to any person the right to speech or expression protected by the United States or Georgia Constitutions, nor [is it] the intent to deny or restrict the rights of any adult to obtain or view any sexually oriented performance or materials protected by the United States or Georgia Constitutions." The ordinance itself states: "This Article is not intended as a de facto prohibition of legally protected forms of expression." Fulton County, Ga., Code § 18-76. The ordinance is, therefore, unrelated to the suppression of free expression.

The fourth prong -- the least restrictive means -- is easily met as well. Because the ordinance targets only adult entertainment establishments where alcohol is consumed, it is sufficiently narrow to meet the O'Brien test: "The

23

ordinance does not prohibit all nude dancing, but only restricts nude dancing in those locations where the unwanted secondary effects arise." Wise Enters., 217 F.3d at 1365 (cited in Flanigan's, 242 F.3d at 984-85).

We focus our analysis, then, on the second prong of the O'Brien test -- whether the ordinance furthers the governmental interest. To meet the furtherance prong, a municipality "must have 'some factual basis for the claim that [adult] entertainment in establishments serving alcoholic beverages results in increased criminal activity' and other undesirable community conditions." Flanigan's, 242 F.3d at 985 (alteration in original) (quoting Grand Faloon Tavern, Inc. v. Wicker, 670 F.2d 943, 949 (11th Cir. 1982)). "The government must . . . show that the articulated concern had more than merely speculative factual grounds, and that it was actually a motivating factor in the passage of the legislation." Krueger, 759 F.2d at 855 (citations omitted).

The factual basis may come from a number of places. "[A] city need not 'conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.'" Daytona Grand, 490 F.3d at 875 (quoting Alameda Books, 535 U.S. at 451 (Kennedy, J., concurring in the judgment)). "Although a municipality 'must rely on at least

24

some pre-enactment evidence,' such evidence can consist of 'a municipality's own findings, evidence gathered by other localities, or evidence described in a judicial opinion.'" Id. (quoting Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, Fla., 337 F.3d 1251, 1268 (11th Cir. 2003)); see also City of Erie v. Pap's A.M., 529 U.S. 277, 296-97 (2000) (plurality opinion) (discussing the role of prior legal opinions in an O'Brien analysis). Governments are also empowered to rely on "their own wisdom and common sense," Sammy's of Mobile, Ltd. v. City of Mobile, 140 F.3d 993, 997 (11th Cir. 1998), cert. denied, 529 U.S. 1052 (2000), and "[c]ommon sense indicates that any form of nudity coupled with alcohol in a public place begets undesirable behavior." Id. (alteration in original) (quoting N.Y. State Liquor Auth. v. Bellanca, 452 U.S. 714, 718 (1981)).

While a governmental entity need not support its regulations with voluminous data, it may not "rely on 'shoddy data or reasoning' and its 'evidence must fairly support [its] rationale.'" Peek-A-Boo Lounge, 337 F.3d at 1269 (alteration in original) (citing Alameda Books, 535 U.S. at 438 (plurality opinion)); see also Daytona Grand, 490 F.3d at 880. Nevertheless, "[a]necdotal evidence is not 'shoddy' per se." Daytona Grand, 490 F.3d at 881.

In order to establish that "secondary effects pose a threat, the city need not 'conduct new studies or produce evidence independent of that already generated by

25

other cities . . . so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.'" Flanigan's, 242 F.3d at 985 (alteration in original) (quoting Pap's, 529 U.S. at 296). However, if a governmental entity does perform empirical studies, it cannot later "ignore the results." Id. at 986.

Ultimately, the test hinges on the reasonableness of the government regulation in light of the available evidence: "Our own cases demonstrate that we require some reasonable justification for legislation which suppresses, albeit incidentally, protected expression." Id. at 985 (citing Sammy's, 140 F.3d at 997, and Wise Enters., 217 F.3d at 1364). The test requires deference to the reasoned judgment of a governmental entity: "a city must have latitude to experiment, at least at the outset, and . . . very little evidence is required." Daytona Grand, 490 F.3d at 880 (quoting Alameda Books, 535 U.S. at 451 (Kennedy, J., concurring in the judgment)).

A plurality of the Supreme Court has directed that local legislatures receive this latitude because deference

> is the product of a careful balance between competing interests. On the one hand, we have an obligation to exercise independent judgment when First Amendment rights are implicated. On the other hand, we must acknowledge that the [governmental entity] is in a better position than the Judiciary to gather and evaluate data on local problems.

Alameda Books, 535 U.S. at 440 (plurality opinion) (citations and quotation marks omitted). As Justice Kennedy stated in the controlling opinion, "[t]he Los Angeles City Council knows the streets of Los Angeles better than we do. It is entitled to rely on that knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion." Id. at 451-52 (Kennedy, J., concurring in the judgment) (citations omitted). In the end, "[o]ur review is designed to determine whether the City's rationale was a reasonable one, and even if [the plaintiff] demonstrates that another conclusion was also reasonable, we cannot simply substitute our own judgment for the City's." Daytona Grand, 490 F.3d at 882.

With these legal principles in mind, and affording proper deference to the County's expertise on the nature of problems confronting its communities and its citizens, we consider the constitutionality of the Fulton County ordinance. We conclude that it was reasonable for the County to rely on the voluminous evidence before it -- including the many findings of the July 2001 report, the numerous foreign studies appended to it, and the live testimony of the chief of police and the chief judge of the juvenile court -- and that the ordinance therefore survives intermediate scrutiny.

The report was full of evidence of crime occurring around the County's strip clubs. Thus, for example, Operation Summit Up, described in the report,

27

established that the areas surrounding the strip clubs are rife with sex and drug crimes. Over a three-week period in 1998, County police made 167 arrests. These arrests arose from 221 total charges, including ninety-three for sex-related crimes and thirty-four for drug-related crimes. And from the 167 arrests, prosecutors secured 166 convictions. Similarly, the report's discussion of beats 21 and 23 shows that those beats accounted for a disproportionate amount of crime in the precinct, and that grid B43, which contains three of the strip clubs, made for a disproportionate amount of crime in those two beats. Moreover, the surveillance operations suggest strongly that crime did occur at the clubs themselves.

The report also described the impact of the clubs on the County's youth. The Hickson affidavit discussed how many prostituted girls worked in the clubs and performed sex acts for money around the clubs and at private parties. The strip clubs, according to Judge Hickson, in addition to contributing to the sexual exploitation of these underage girls, also imposed a burden on the judicial system when the girls were brought before the juvenile court.

The report also addressed the negative secondary effects of the clubs in a non-criminal context. The Stafford affidavit, along with the accompanying photographs, suggest that the areas around the clubs are indeed blighted. The image created is one of deterioration and neglect, an urban landscape dominated by

cheap hotels catering to the sex trade. The newspaper articles further portrayed adult entertainment establishments as a drag on property values, neighborhood development, and community safety.

Completing the July 2001 report were the foreign studies. All told, Fulton County considered the experiences of thirty American jurisdictions. These foreign studies, summarized by the NLC and in two cases reproduced in their entirety by the County, painted a moribund picture of the adult business and the communities surrounding them. They told of crime, disease, violence, blight, and depressed property values.

The plaintiff clubs argue, nevertheless, that the principal thesis of the July 2001 report -- that the mixture of alcohol and nude dancing leads to crime -- is undercut by the March 2001 report, which found that crime was a greater problem at bars without nude dancing. Yet the clubs -- and the district court -- misapprehend the nature of our inquiry. We cannot simply survey the vast field of literature and declare unconstitutional any ordinance which fails to conform with our own sense of that course which is most prudent. See Daytona Grand, 490 F.3d at 881 ("[D]emonstrating the possibility of such an alternative does not necessarily mean that the City was barred from reaching other reasonable and different conclusions."). Rather, we consider the evidence the municipality relied on in

passing the ordinance, and determine whether such reliance was reasonable. See

id. at 882. Because the July 2001 report established negative secondary effects

both criminal and urban, we hold that it was reasonable for the County to rely on it.

Moreover, the March 2001 report championed by the clubs has its own

infirmities. The principal finding of the March 2001 report is that, for a three-year

period, bars without nude dancing generated more 911 calls than bars with nude

dancing. Yet as the County argues, and as this Court has already noted, sex-related

offenses often do not prompt a call to the police:

> The experts' studies are based solely on CAD data, which, in lay
> terms, is essentially 911 emergency call data. Relying on such data to
> study crime rates is problematic, however, because many crimes do
> not result in calls to 911, and, therefore, do not have corresponding
> records in the City's CAD data. This is especially true for crimes[]
> such as lewdness and prostitution . . . .
>
> Such crimes are often "victimless," in the sense that all of those
> involved are willing participants, and, therefore, they rarely result in
> calls to 911. . . . [A]n encounter between a prostitute and a "john"
> rarely leads to a 911 call. By contrast, the City's "anecdotal"
> evidence may be a more accurate assessment of such crimes because it
> is not based on a data set that undercounts the incidents of such
> "victimless" crimes.

Id. at 882-83 (citation omitted).

It was not unreasonable for the County to credit the July 2001 report, which

portrayed in great detail the criminal activity that occurs in and around the clubs,

over a March 2001 study which relied on police call data, a method notoriously

unreliable under these circumstances.  See id. at 883 n.33 ("We also note that at least three other circuits have rejected, for similar reasons, attempts by plaintiffs to use studies based on CAD data to cast direct doubt on an ordinance that the municipality supported with evidence of the sort relied upon by the City of Daytona Beach here." (citing Gammoh v. City of La Habra, 395 F.3d 1114, 1126-27 (9th Cir. 2005), G.M. Enters., Inc. v. Town of St. Joseph, Wis., 350 F.3d 631, 639 (7th Cir. 2003), and SOB, Inc. v. County of Benton, 317 F.3d 856, 863 & n.2 (8th Cir. 2003))).

We note other drawbacks to the March 2001 report as well.  First and foremost, its scope is much narrower than that of the July 2001 report.  In focusing exclusively on calls for police service, the March 2001 report fails to cast any doubt on the evidence of community blight, urban decay, exploitation of minors, and increased burdens on the judicial system documented in the July 2001 report.  Cf. id. at 875-76.  Next, the March 2001 report comes with a disclaimer that its findings are indeed limited: "The data does not address other secondary factors that may influence the calls for services at either type of establishment."  Moreover, the March 2001 report makes no attempt to distinguish between types of crime.  There is no way to tell from the report, for instance, whether masturbation for hire and other sex crime is lower or higher in and around the adult establishments -- we are

31

told, simply, that the non-adult bars generate more calls for service. Even if we were to accept that crime is greater in and around the non-adult establishments -- and the record is hotly disputed on this point -- a municipality would still be empowered to act in order to check a class of crime it found to be particularly troublesome.[9]

The plaintiff clubs offer the affidavit of Robert Bruce McLaughlin, who criticizes the foreign studies cited in the July 2001 report and challenges the reliability of the report itself. We are aware that there are some shortcomings in the July 2001 report. Some of the statistics are offered here without adequate controls, and when the report does engage in statistical comparison, its methodology begins to fray. For instance, the report notes that the BYOB club accounted for only 4% of the incidents reported at six Fulton County strip clubs. However, the report reveals later that the BYOB club is only open three days a week. If the report reconciles its conclusion with this fact, nowhere does it say so.

These arguable defects, however, when considered alongside the entirety of

---

[9] The County also argues that a police moratorium on enforcement of the 1997 adult entertainment establishment ordinance reduced the number of 911 calls. We find this argument unpersuasive, as it presupposes that a violation of the ordinance -- a prohibited lap dance, for example -- would likely give rise to a police call for service. The County next asserts that victims of or witnesses to crime, embarrassed to have been at an adult establishment, are reluctant to call the police from a strip club, so they move off-site before dialing 911. This argument further underscores the unreliability of police call data as an accurate measure of crime rates.

the record the County considered, do not yield constitutional infirmity. We are called upon today only to consider the constitutionality of an ordinance targeting the incidental effects of expressive activity protected by the Constitution. The foundation upon which the County relied need not be perfect; it need only be reasonable. We emphasize that, in this context, the County need not offer advanced statistical evidence, nor refute every conceivable interpretation of the data, even if those interpretations may be more compelling than the one reached by the municipality. It need only show that it acted reasonably, and here, Fulton County has met this burden.

Plainly, we are not faced here with the same situation we confronted the first time these parties came before this Court. It is one thing to compare foreign studies (in that case, four foreign studies) in support of an ordinance to a chorus of local studies decrying the wisdom of the ordinance. See Flanigan's Enters., Inc. of Ga. v. Fulton County, Ga., 242 F.3d 976, 986 (11th Cir. 2001) (holding that it was unreasonable "to ignore relevant local studies and rely instead upon remote foreign studies"). It is quite another thing entirely to compare a wide-ranging set of statistical, observational, and anecdotal evidence, bolstered by many foreign studies, in support of an ordinance to one study of at least arguable empirical merit in contravention of that ordinance.

While the evidence offered has limitations, it certainly creates a vivid image of a County in which strip clubs that served alcohol played a prominent and unwelcome role. Sex and drug crimes occured in and around the clubs and the neighborhood's cheap hotels, and required law enforcement and the judiciary (the juvenile court, at least) to invest resources in combating the secondary effects. Moreover, the neighborhoods themselves were dilapidated and in need of repair. It was not unreasonable for the County to rely on this data when passing an ordinance forbidding the sale, consumption, and possession of alcohol in adult entertainment establishments.

We do not share the skepticism of the district court regarding the motives of Fulton County. It is undisputed that the County wished to reduce the secondary effects of alcohol and adult entertainment within its borders: it had passed a similar ordinance, for similar reasons, in 1997, and its board of commissioners ordered a new investigation into the problem just as soon as this Court struck down the 1997 ordinance in 2001. That Fulton County sought to compile empirical evidence of a problem it believed to exist -- evidence it assumed was necessary under the law of this Circuit -- does not somehow divest the project of all legitimacy.

Moreover, we are not alarmed that the County continued its investigation into the subject after March 2001, when it received the Adult and Non-Adult

Entertainment Establishments Statistical Analysis. Local problems are often complex. They may require careful study and patient resort to sources whose messages are sometimes inconsistent. County commissioners are not bound to abide by the conclusions of the first reports to cross their desks, no matter how clumsy or incomplete. Rather, a county may consider an issue of local governance so that it fully understands the contours of the problem, and the most efficacious ways to combat it. That the County's investigation of the clubs continued after the delivery of the March 2001 report does not render nugatory the totality of what it learned later.

We have explained that the evidence relied on by a municipality in support of an ordinance may not be shoddy, and the process by which it investigates a perceived problem may not be a sham. See Daytona Grand, 490 F.3d at 880. The defendant clubs suggest that the fix was in from the start, but we are satisfied that Fulton County's concern for the health and safety of its communities is real, and that its reliance on the evidence it offers is not unreasonable.

Because the challenged ordinance survives intermediate scrutiny, damages should not have been awarded to the clubs, and we need not determine whether the amounts awarded were proper. We express no opinion, however, about the remaining issues in the case -- whether the ordinance allows for reasonable

alternative channels of communication, whether it imposes an impermissible prior restraint, and whether it unlawfully imposes a tax on conduct protected under the First Amendment -- which were raised by the clubs in their cross-appeal but were never reached by the district court.  These are best addressed in the first instance by the district court.  Accordingly, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

REVERSED and REMANDED.