[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-14428
_____

D.C. Docket No. 1:09-cv-02747-LMM


FLANIGAN'S ENTERPRISES, INC. OF GEORGIA,
d.b.a. Mardi Gras,
FANTASTIC VISUALS, LLC,
d.b.a. Inserection,
6420 ROSWELL RD., INC.,
d.b.a. Flashers,

                                        Plaintiffs - Appellants,

MARSHALL G. HENRY, et al.,

                                        Intervenor Plaintiffs,

versus

CITY OF SANDY SPRINGS, GEORGIA,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(August 14, 2017)

Before ED CARNES, Chief Judge, and ROSENBAUM and DUBINA, Circuit Judges.

PER CURIAM:

Plaintiffs-Appellants Flanigan's Enterprises, Inc. of Georgia (d.b.a. "Mardi Gras") ("Mardi Gras") and 6420 Roswell Rd., Inc. (d.b.a. "Flashers") ("Flashers"), are strip clubs located in the once-unincorporated territory of Fulton County, Georgia (the "County"), now a part of the City of Sandy Springs, Georgia (the "City").    Plaintiff-Appellant Fantastic Visuals, LLC (d.b.a. "Inserection") ("Inserection"), is a sex shop also located in the City.  Following a history of litigation with the County, Mardi Gras and Flashers believed, along with Inserection (collectively, "Plaintiffs"), that they were unfairly subjected to a number of the City's adult-entertainment ordinances, so they asserted a mélange of constitutional claims against the City.

The district court entered summary judgment against Plaintiffs on some claims.  After a bench trial on a number of Plaintiffs' remaining claims, the court entered a final judgment against Plaintiffs on those claims.  Plaintiffs appeal, asking us to announce three new and substantial changes in the law governing their right to free speech and expression under both the U.S. and Georgia Constitutions. For the reasons below, we decline Plaintiffs' invitation and affirm the district court's judgment.

**I.**

2

**A.**

This appeal is the latest iteration of a litigation saga that traces its origins to 1997, when the County amended its code to prohibit the sale and consumption of alcoholic beverages in adult-entertainment establishments featuring live nude or partially nude performances. *See Flanigan's Enters., Inc. of Ga. v. Fulton County, Ga.* ("*Flanigan's I*"), 242 F.3d 976, 978-81 (11th Cir. 2001). The following year, Mardi Gras and Flashers, along with other plaintiffs, filed federal suits against the County, claiming that the alcohol ban violated their constitutional rights. *See id.* at 981.

The cases eventually made their way to us, and we found that, in light of well-established precedent, the alcohol ban was a content-neutral regulation of expressive conduct subject to the test established in *United States v. O'Brien*, 391 U.S. 367 (1968). *See Flanigan's I*, 242 F.3d at 982-84. We stated, "Under *O'Brien*, an ordinance is valid if: (1) it serves a substantial interest within the power of the government; (2) the ordinance furthers that interest; (3) the interest served is unrelated to the suppression of free expression; and (4) there is no less restrictive alternative." *Id.* at 984 (citing *O'Brien*, 391 U.S. at 377).

Though we concluded that the County easily satisfied the first, third, and fourth prongs of the test, *see id.* at 984-85, the plaintiffs ultimately prevailed because the County failed to establish the second prong. For that prong, we

recognized that "[t]he avoidance of criminal activity, protection of property values, and avoidance of community blight are undeniably important" government interests. *Id.* at 985. But we also determined that the County failed to demonstrate that it reasonably relied on evidence showing that the alcohol ban furthered those interests because "the [C]ounty's own studies negated the very interests it purportedly sought to prevent." *Id.* at 985-87. We ruled that the County was not permitted to reject those studies and rely instead on "studies from different cities and different time periods." *Id.* at 987. So we declared the alcohol ban unconstitutional. *See id.*

Nine years later, the plaintiffs from *Flanigan's I*, including Mardi Gras and Flashers, came back for another round, and our decision in *Flanigan's Enterprises, Inc. of Georgia v. Fulton County, Georgia* ("*Flanigan's II*"), 596 F.3d 1265 (11th Cir. 2010), resulted. In the wake of *Flanigan's I*, the County had passed essentially the same alcohol ban, except that it was supported by a stronger pre-enactment evidentiary record. *See id.* at 1270-74. Upon reviewing this record, we concluded, "This time around, the County relied on ample statistical, surveillance, and anecdotal evidence . . . [to] support the County's efforts to curb the negative secondary effects of alcohol and live nude dancing in its communities." *Id.* at 1269. So we found that the second prong of the *O'Brien* test was satisfied, but we

4

still remanded the case to the district court for further proceedings with respect to other issues. *See id.* at 1276-83.

In December 2005, while the litigation that led to our decision in *Flanigan's II* was ongoing, the City of Sandy Springs came into existence as a municipality within the County. That same month, the City promulgated a number of regulations covering adult-entertainment establishments, including a ban on alcoholic beverages in adult-entertainment establishments. In enacting these regulations, the City reviewed a robust legislative record detailing the adverse secondary effects of adult-entertainment establishments. Over time, the City enacted additional adult-entertainment regulations and amended some of its existing ones.

**B.**

Mardi Gras, Flashers, and Inserection are businesses located within the City. Mardi Gras and Flashers operate establishments where dancers perform in the nude and where alcohol is sold and served to patrons; they continue to serve alcohol, despite the City's ban, pursuant to a consent agreement. Inserection is both a store that sells sexually explicit media, sexual devices, and other sex-related products, and an arcade at which patrons can pay to view sexually explicit videos.

Plaintiffs filed the instant suit against the City in the U.S. District Court for the Northern District of Georgia, claiming that various provisions of the City's

Alcohol Code, Adult Zoning Code, and Adult Licensing Code violated a number of their rights under the U.S. and Georgia Constitutions. After the parties conducted discovery, the City moved for summary judgment.

The district court granted summary judgment in favor of the City on various claims that Plaintiffs have not raised on appeal, but it denied the City's summary-judgment motion with respect to other claims.[1] As relevant to this appeal, Plaintiffs argued in opposition to the City's motion that a number of the adult-entertainment ordinances challenged under the First Amendment to the U.S. Constitution failed strict scrutiny and that even if the ordinances were instead subject to intermediate scrutiny, they failed that standard as well. The district court by and large rejected this argument. But it nevertheless ruled that the relevant claims were not fit for adjudication by way of summary judgment because factual issues underlying the court's application of intermediate scrutiny remained.

Plaintiffs also challenged the ordinances under the Free Speech Clause of the Georgia Constitution on substantially the same grounds. On these claims, however, the court entered judgment for the City.

---

[1] Prior to ruling on the motion for summary judgment, the court severed Plaintiffs' claims challenging the City's ordinance that prohibited the sale of sexual devices in the City. Those severed claims were litigated separately, and eventually they became the subject of this Court's decision in *Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs, Georgia*, 831 F.3d 1342 (11th Cir. 2016), which has been vacated in light of the Court's decision to review the case en banc, *see Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs, Ga.*, --- F.3d ----, No. 14-15499, 2017 WL 975958 (Mem) (11th Cir. Mar. 14, 2017).

6

Later, the court conducted a four-day bench trial on a small group of remaining claims that Plaintiffs still wished to prosecute. Ultimately, the district court issued its findings of fact and conclusions of law and entered final judgment in favor of the City.

## II.

Plaintiffs appeal both the entry of summary judgment and the judgment entered after the bench trial. A district court's entry of summary judgment is subject to a *de novo* standard of review on appeal. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284 (11th Cir. 1997). Summary judgment is properly entered if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).

When a district court enters judgment after a bench trial, we generally review the district court's conclusions of law *de novo* and findings of fact for clear error. *See Tartell v. S. Fla. Sinus & Allergy Ctr., Inc.*, 790 F.3d 1253, 1257 (11th Cir. 2015). But while, in the typical case, "we review district court factfindings only for clear error, . . . First Amendment issues are not ordinary." *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1203 (11th Cir. 2009). So in the context of First Amendment claims, we review findings of "constitutional facts,"

7

as opposed to "ordinary historical facts," *de novo*.  *Id.* (citations and internal quotation marks omitted).

## III.

On appeal, Plaintiffs argue that the district court erred in granting judgment in favor of the City on various claims brought under the First Amendment to the U.S. Constitution.  According to Plaintiffs, these claims challenge ordinances that are content based.  Plaintiffs acknowledge that if precedent predating *Reed v. Town of Gilbert, Arizona*, 135 S. Ct. 2218 (2015), applied, the district court may have been correct in subjecting these ordinances to intermediate scrutiny.  But they contend that *Reed* changed the applicable law so that the ordinances should have been subjected to strict scrutiny.  Mardi Gras and Flashers also argue that, even if the ordinances are not subject to strict scrutiny, they still fail the proportionality test set forth by Justice Kennedy in his concurrence in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002)—a test that they claim constitutes binding law in this Circuit.  We reject both of these arguments.

## A.

We begin our discussion of Plaintiffs' *Reed* argument by reviewing the state of the law before *Reed* was decided.  The ordinances that Plaintiffs challenge regulate freedom of speech and expression in the adult-entertainment context.  On their face, the ordinances may appear to be content based because they target adult

8

entertainment; so if we were applying general principles of First Amendment law, the ordinances would be subjected to strict scrutiny. *See Wollschlaeger v. Governor, State of Fla.*, 848 F.3d 1293, 1308 (11th Cir. 2017) (en banc) ("Content-based restrictions on speech normally trigger strict scrutiny.").

Yet under equally well-established Supreme Court and Eleventh Circuit precedent, adult-entertainment ordinances are not treated like other content-based regulations. *See Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, Fla. ("Peek-A-Boo II")*, 630 F.3d 1346, 1353-54 (11th Cir. 2011). Two strands of case law, often intertwined, embody this exception: (1) the zoning strand, which deals with ordinances that regulate land use for adult-entertainment businesses, such as stores that sell pornography and theatres that play pornography; and (2) the public-nudity strand, which deals with ordinances that ban public nudity as a general matter and thereby indirectly regulate nude dancing.[2]

These two strands of case law are part of the "secondary-effects doctrine," which we have summarized as follows:

> Zoning ordinances that regulate the conditions under which sexually oriented businesses may operate are evaluated as time, place, and manner regulations, following a three-part test set forth by the Supreme Court in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46–50, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986) and reaffirmed in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448, 122 S. Ct. 1728, 152 L. Ed. 2d 670 (2002). Content-neutral public nudity

---

[2] The City's ban on alcohol in nude-dancing establishments falls within this second strand of case law. *See Flanigan's I*, 242 F.3d at 983-84.

9

ordinances, by contrast, involve expressive conduct and must therefore be measured against a four-part test set forth in *United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968), and applied in the context of adult entertainment in *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 567, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991), and in *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S. Ct. 1382, 146 L. Ed. 2d 265 (2000).

*Peek-A-Boo II*, 630 F.3d at 1354 (footnote omitted).

The zoning line of precedent requires courts to engage in a three-step inquiry to evaluate the constitutionality of a provision under the First Amendment. First, a court determines whether a challenged zoning ordinance is an invalid total ban on any given type of adult-entertainment business activity or is instead a time, place, and manner regulation. Second, if the ordinance is a time, place, and manner regulation, the court determines whether the ordinance should be subjected to intermediate or strict scrutiny. And third, if intermediate scrutiny applies, then the court assesses whether the ordinance serves a substantial government interest and allows for reasonable alternative channels of communication. *See Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, Fla. ("Peek-A-Boo I")*, 337 F.3d 1251, 1264 (11th Cir. 2003).

At step two of this analysis, the court decides whether to apply intermediate or strict scrutiny based on the government's interest in enacting the challenged ordinance. If the government sought to restrict the adult-entertainment-related speech because of the speech's content, then the ordinance must be evaluated

10

under strict scrutiny. *See id.* at 1264-65 & n.14. But if the government intended to combat the "secondary effects" of adult entertainment in the surrounding community—*i.e.*, increased crime, decreased property values, etc.—then the ordinance is held to intermediate scrutiny. *Id.* In other words, intermediate scrutiny applies if the ordinance can be "*justified* without reference to the content of the regulated speech." *Renton*, 475 U.S. at 48 (emphasis in original; internal quotation marks and citations omitted). It is this part of this test from which the term "secondary-effects doctrine" is derived.

The framework for analyzing public-nudity ordinances is similar. The first step is substantially the same as the second step of the zoning framework: the court asks whether the government's purpose in enacting the ban on public nudity is related to the suppression of the erotic message conveyed by nude dancing. *See Flanigan's I*, 242 F.3d at 983. If it is, then the ban is subject to strict scrutiny; but if the ban is motivated by some other purpose, then the *O'Brien* test, which is less restrictive than strict scrutiny, applies. *See id.* Under the *O'Brien* test, "an ordinance is valid if: (1) it serves a substantial interest within the power of the government; (2) the ordinance furthers that interest; (3) the interest served is

unrelated to the suppression of free expression; and (4) there is no less restrictive alternative." *Id.* at 984.[3]

Plaintiffs contend the Supreme Court's recent decision in *Reed* altered the landscape of First Amendment jurisprudence so radically that it uprooted the secondary-effects doctrine. The Supreme Court in *Reed* considered whether a municipal sign code improperly treated signs differently, depending on the category into which the sign fell, such as "ideological," "political," or "temporary directional." 135 S. Ct. at 2224-25. The Ninth Circuit had held that the code was content neutral because the town adopted the code not based on any disagreement the town had with the different types of regulated content, but rather based on interests unrelated to content. *See id.* at 2226. The Ninth Circuit thus subjected the code to a lower level of scrutiny. *See id.*

The Supreme Court reversed, concluding that the sign code was "content based on its face" because the code's restrictions applied to signs differently, "depend[ing] entirely on the communicative content of the sign." *Id.* at 2227. The Court made clear that "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message

---

[3] The Supreme Court has articulated at least two reasons why sexually explicit speech (and expression) is treated differently under the First Amendment than other types of content-based speech are treated: (1) sexually explicit speech is associated with harmful secondary effects in a way that other protected speech typically is not, and (2) sexually explicit speech is less valuable to our society than other types of protected speech. *See Free Speech Coal., Inc. v. Att'y Gen. U.S.*, 825 F.3d 149, 175-76 (3d Cir. 2016) (Rendell, J., dissenting).

expressed," and the Court reiterated the long-standing principle that content-based laws are subject to strict scrutiny. *Id.* In addition, the Court expressly rejected the Ninth Circuit's finding that a court could rely on the town's justification for enacting the sign code when conducting "content-neutrality analysis": "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 2228 (citation omitted); *see also id.* ("In other words, an innocuous justification cannot transform a facially content-based law into one that is content neutral.").

There is no question that *Reed* has called into question the reasoning undergirding the secondary-effects doctrine. The secondary-effects doctrine allows a content-based, adult-entertainment-related law to be subjected to less than strict scrutiny as long as the law can be justified by a legitimate interest in combating the harmful secondary effects of adult entertainment. The majority opinion in *Reed*, of course, rejected the lower court's reliance on the sign code's justification in conducting content-neutrality analysis; the Court also declared that content-based laws should be subjected to strict scrutiny.

13

But significantly, the majority opinion in *Reed* did not address the secondary-effects doctrine.[4] For this reason alone, we cannot read *Reed* as abrogating either the Supreme Court's or this Circuit's secondary-effects precedents. The rule is simple: "If a precedent of th[e Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to th[e Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (alterations added); *see also Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 462 (11th Cir. 1996) ("[A] prediction [that the Supreme Court will overrule its own precedent] may be accurate, but we are not at liberty to disregard binding case law that is so closely on point and has been only weakened, rather than directly overruled, by the Supreme Court." (alterations added)).

The Supreme Court's and our secondary-effects precedents are on all fours with the adult-entertainment regulations before us;[5] *Reed*, which addressed a sign

---

[4] Plaintiffs read Justice Kagan's concurrence as advocating for a qualification of the majority's reasoning so that the secondary-effects doctrine could be left intact. *See Reed*, 135 S. Ct. at 2238 (Kagan, J., concurring). Regardless of whether certain aspects of Justice Kagan's concurrence may prove to be correct, however, today we must concern ourselves with only the holding of the majority in *Reed*.

[5] Plaintiffs argue that some of the ordinances they challenge are not zoning ordinances but rather content-based ordinances of other varieties that are therefore subject to strict scrutiny. We are unpersuaded that Plaintiffs' zoning/non-zoning dichotomy has legal force when the ordinances in question clearly were designed to combat the adverse secondary effects of adult entertainment.

14

code, is not. We therefore follow the secondary-effects doctrine because it has "direct application" in this case, notwithstanding that it may "appear[] to rest on reasons rejected in [*Reed*]." *Rodriguez de Quijas*, 490 U.S. at 484 (alteration added).

## B.

Mardi Gras and Flashers argue also that, even if the district court properly applied intermediate scrutiny, the court erred in not subjecting the alcohol ban to the proportionality test articulated by Justice Kennedy in his *Alameda Books* concurrence. Had the court applied this test, they assert, the court would have found that the alcohol ban would deprive Mardi Gras and Flashers of a vital source of income (that is, alcohol sales), rendering Mardi Gras and Flashers financially unable to continue operating. According to Mardi Gras and Flashers, that the alcohol ban would have put them out of business means that the ban would silence speech in an amount disproportionate to the amount of secondary effects that the ban would combat. And as Mardi Gras and Flashers see it, this would render the ban unconstitutional under the proportionality test.

Justice Kennedy's *Alameda Books* concurrence, which was not joined by another Justice, explored at length his theory that, for a government to advance a legitimate interest in combating harmful secondary effects, the government must establish not only "that its regulation has the purpose and effect of suppressing

15

secondary effects" (a requirement that was, by then, governing law), but also that the regulation "leav[es] the quantity and accessibility of speech substantially intact." *Alameda Books*, 535 U.S. at 449 (Kennedy, J., concurring). We refer to this latter requirement as the "proportionality test" because the test assesses whether the challenged law disproportionately silences speech in order to reduce the adverse secondary effects of that speech. *See id.* at 451 ("It is true that cutting adult speech in half would probably reduce secondary effects proportionately. But again, a promised proportional reduction does not suffice.") (Kennedy, J., concurring).

Justice Kennedy concurred with the *Alameda Books* plurality opinion penned by Justice O'Connor because he agreed about the quantum of evidence necessary for the government to prove that a challenged law was motivated by a desire to counteract adverse secondary effects. *See Peek-A-Boo I*, 337 F.3d at 1263-64 (explaining *Alameda Books*). But Justice Kennedy expressly recognized that the plurality's opinion did not account for his proportionality test. *See Alameda Books*, 535 U.S. at 450 ("The plurality's analysis does not address how speech will fare under the city's ordinance. As discussed, the necessary rationale for applying intermediate scrutiny is the promise that zoning ordinances like this one may reduce the costs of secondary effects without substantially reducing speech.") (Kennedy, J., concurring).

16

This Circuit has used broad language to characterize Justice Kennedy's concurrence as precedential. *See Peek-A-Boo I*, 337 F.3d at 1264; *Daytona Grand, Inc. v. City of Daytona Beach, Fla.*, 490 F.3d 860, 874 n.20 (11th Cir. 2007). But, of course, his concurrence is binding only to the extent that it can be harmonized with the plurality's opinion. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . ." (citation and internal quotation marks omitted)). Because Justice Kennedy's *Alameda Books* proportionality test cannot be harmonized with the plurality's opinion, it is not binding Supreme Court precedent.

Nevertheless, that does not mean that this Circuit has not adopted the proportionality test as Circuit law. Decisions of this Court arguably have spoken approvingly of the proportionality test. In *Peek-A-Boo I*, we stated in a footnote that "Justice Kennedy's controlling opinion [in *Alameda Books*] emphasized that secondary effects ordinances must accomplish their goal of combating secondary effects 'while leaving the quantity and accessibility of speech substantially intact.'" 337 F.3d at 1274 n.23 (alteration added; citation omitted). Elsewhere in the opinion, we explained that "[t]he key issue" under Justice Kennedy's test "is 'how speech will fare' under the ordinance." *Id.* at 1263 (citation omitted). Later, in

17

*Peek-A-Boo II*, we noted that the county defendant was not required "to produce empirical evidence or scientific studies as long as it 'advance[d] some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact.'" 630 F.3d at 1355 (quoting *Alameda Books*, 535 U.S. at 449 (Kennedy, J., concurring)).[6] All of these statements, however, are dicta. In these cases, we did not apply the proportionality test to reach a holding; we ruled on other grounds. Dicta lacks binding precedential value. *See Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010).

We could nevertheless adopt the proportionality test for the first time today. Under the circumstances, though, we are not inclined to do so. That *Reed* has called into question the fundamental underpinnings of the secondary-effects doctrine, even suggesting that the doctrine may be abrogated, counsels against extending the doctrine based on the opinion of one Supreme Court Justice in one of his concurrences, which was based on a fact pattern not present in this case. In *Alameda Books*, the Court examined a dispersal ordinance, which provided in part that no more than one adult-entertainment establishment could operate within any

---

[6] Plaintiffs cite *Flanigan's II* and *Daytona Grand* as further support for their contention that this Circuit has spoken favorably of the proportionality test, but neither of those decisions mentions the test.

given building and that adult-entertainment establishments could not be located within a certain distance of each other.  *See Alameda Books*, 535 U.S. at 430-31.

Here, by contrast, we have a range of regulations to consider, and some have functions that are quite different from dispersal ordinances.  The question of whether to apply the proportionality test would be a difficult one even if we were faced with the same type of ordinance as that at issue in *Alameda Books*.  But today we encounter a variety of different ordinances, and we do so in a post-*Reed* jurisprudential landscape.  We therefore decline to adopt Justice Kennedy's proportionality test.

Plaintiffs do not otherwise contest the district court's application of intermediate scrutiny to their federal claims.  So we affirm the district court's judgment in favor of the City with respect to these claims.[7]

## IV.

Inserection separately challenges the district court's dismissal of its claims brought under the Free Speech Clause of the Georgia Constitution that take issue with the ordinances that apply to Inserection because of Inserection's status as an "adult bookstore."  Inserection contends that these ordinances are content based and subject to strict scrutiny and that, under Georgia law, the strict-scrutiny analysis for an adult-entertainment regulation requires the City to prove that its

---

[7] Because we affirm the judgment as to the federal claims on these grounds, we decline to address the City's issue-preclusion defense.

19

ordinances are the "least restrictive means" of achieving the City's goals. Inserection argues that the City has not met this burden.

The City urges us not to reach the merits of Inserection's argument because Inserection failed to raise this argument before the district court.[8]    Indeed, Inserection did.  The only part of Plaintiffs' second amended complaint that refers to a "least restrictive means" analysis is Plaintiffs' claim relating to a lawsuit the City filed against Plaintiffs in state court—a claim that Plaintiffs have not raised as an issue on appeal.  Inserection's claims that the ordinances premised on the "adult bookstore" definition fail the "least restrictive means" test have not been properly preserved because Plaintiffs did not raise the issue below.

As a general rule, this Court does not consider issues raised for the first time on appeal—these issues are not properly preserved for our review.  *See CSX Transp., Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1336 (11th Cir. 2017).  Rather, the party seeking to raise the issue must first present it to the district court in a manner that allows the court "an opportunity to recognize and rule on it," and then the party may properly present it to this Court on appeal.  *Id.* at 1336-37 (citation and internal quotation marks omitted).

Inserection nevertheless asks us to excuse this mistake.  We recently recited the circumstances under which a failure to properly preserve an issue may be

---

[8] The City also asserts that Inserection lacks standing.

20

excused on appeal, *see Blue Martini Kendall, LLC v. Miami Dade County, Fla.*, 816 F.3d 1343, 1349 (11th Cir. 2016), but we are unpersuaded that Inserection has made such a showing here.

Inserection does not otherwise contest that the district court properly dismissed its Georgia-law claims. We thus find no basis to reverse the district court's judgment in favor of the City on these claims.

## V.

For the foregoing reasons, we **AFFIRM** the district court's judgment.

**AFFIRMED.**